CANTON OIL CORP., a Delaware corporation, Petitioner,

v.

The DISTRICT COURT In and For the SECOND JUDICIAL DISTRICT and the Honorable Sandra I. Rothenberg, a Judge thereof, Respondents.

THELEEN AND PARTNERS, LTD., a Hong Kong corporation, Petitioner,

v.

The DISTRICT COURT In and For the SECOND JUDICIAL DISTRICT and the Honorable Sandra I. Rothenberg, a Judge thereof, Respondents.

Nos. 85SA446, 86SA1.

Supreme Court of Colorado, En Banc.

Jan. 20, 1987.

Rehearing Denied Feb. 9, 1987.

Netzorg & McKeever, P.C., Gordon W. Netzorg, J. Nicholas McKeever, Jr., Hughes, Pelz, Leach & Clikeman, P.C., Harlan P. Pelz, Denver, for petitioner Canton Oil Corp.

Law Offices of John M. Franks, P.C., John M. Franks, Paul R. Wood, Curt Todd, Denver, for petitioner Theleen and Partners, Ltd.

Law Office of Kathleen Mullen, P.C., Kathleen Mullen, Sherman & Howard, Elizabeth J. Greenberg, Peter Lucas, Denver, for respondents.

ROVIRA, Justice.

The petitioners, Canton Oil Corp. and Theleen and Partners, Ltd., seek relief in the nature of prohibition directed against the respondent district court. After a hearing on October 10, 1985, that court set aside a judgment that petitioners had obtained in a civil trial on the ground that jury misconduct had tainted the trial. Petitioners now allege that the court exceeded its jurisdiction and grossly abused its discretion in setting aside the judgment. They request that we prohibit enforcement of the order setting aside the judgment and order its reinstatement. We issued a rule to show cause, and now discharge the rule.

## I.

In the underlying action in this case, petitioner, Canton Oil Corp. (Canton), sought relief pursuant to the Colorado Securities Act of 1981 and also asserted several common law claims including fraud, fraudulent concealment and negligent misrepresentation. On February 28, 1985, after a six-week trial, the jury delivered a verdict in Canton's favor against defendants Nordic Petroleums, Inc., Oene "Owen" Miedema, Seahawk Oil Corporation, and Gary MacLellan. On April 5, 1985, the district court entered judgment for Canton of $2,127,000 including interest. An addi-

tional defendant, Theleen and Partners, Ltd., (Theleen), settled with Canton during trial, and then prevailed on cross claims against defendants Nordic, Seahawk, and Miedema, receiving a verdict of $1.3 million in actual damages and $750,000 in punitive damages. Theleen's judgment was entered February 28, 1985.

On April 26, 1985, the defendants timely filed a motion for new trial under C.R.C.P. 59, citing, among other errors, gross misconduct on the part of some jurors. After responses were filed, the district court on June 19, 1985, scheduled a hearing on the motion for August 21, and then rescheduled the hearing, on its own initiative, for October 10.

In September 1985, petitioners filed motions claiming that the court had lost jurisdiction to rule on the new-trial motion because the court had not complied with C.R.C.P. 59(j), which required the court to rule on the new-trial motion within 60 days of the date it was filed. Theleen pointed out that that deadline had passed on June 26 and requested that the hearing be vacated and the court's stay of judgment lifted. Canton requested that the record be clarified so it, too, could execute on its judgment.

On October 2, 1985, the defendants moved for relief from the judgment under C.R.C.P. 60(b), incorporating by reference the legal and factual matters contained in their motion for new trial. On October 10, 1985, the respondent district court held a hearing over the objections of petitioners and made oral findings of fact and conclusions of law. It concluded that the defendants' new-trial motion had been denied as a matter of law by operation of C.R.C.P. 59(j). It found that, had it then had the opportunity, it would have granted the new-trial motion. Instead, however, the court decided to set aside the judgment under C.R.C.P. 60(b), concluding that the

"gross conduct" of the jurors constituted an "other reason" justifying relief under clause (5) of C.R.C.P. 60(b). The court reaffirmed these findings in its written order issued on November 25, 1985.

On December 6, 1985, Canton filed its petition with this Court seeking relief in the nature of prohibition pursuant to C.A.R. 21. We granted a stay and issued a rule to show cause on December 12. On January 2, 1986, Theleen filed its own petition and moved to consolidate it with Canton's petition. We issued a rule to show cause and granted the motion to consolidate the petitions on January 9. We now discharge the rule.

## II.

The evidence of jury misconduct before the district court came in the form of affidavits submitted by the defendants, the testimony of six witnesses, including four jurors, and religious materials mailed to defendant Miedema by Mrs. Adams,[1] one of the jurors.

In moving for a new trial, the defendants alleged that the jury's verdict was a product of passion and prejudice; that some of the jurors had insinuated a grossly improper "Jewish issue" into the case; that some jurors had perceived a bias on the part of the trial judge, who was Jewish, in favor of defense counsel, who were also Jewish; and that juror Adams, because of her preoccupation with defendant Miedema's religion and her evangelical fervor, was unfit to sit as a juror.

## A.

The evidence concerning the jurors' perceptions of a "Jewish issue" in the case was disputed. The defendants' attorneys, in affidavits submitted to the court, alleged that after the trial one of the jurors, Baker, had told them: that some of the jury mem-

1. For clarity's sake, we use fictitious names—Mrs. Adams, Baker, Mrs. Carr and Ms. Davis—to designate the four jurors who testified at the hearing. The actual names of these jurors are not pertinent to the issues before this court. The conduct of these jurors is relevant to this case only insofar as it is necessary for us to determine whether the district court had jurisdiction to set aside petitioners' judgments and whether the court abused its discretion in doing so.

bers, but not he, had felt that there was "something going on" between the trial judge and defense counsel, meaning, "You know, the Hebrew thing"; that some jurors felt that some of the court's rulings in favor of the defense were evidence that there was "something going on"; and that some jurors openly discussed their feelings as "you know how those Hebrews stick together."

At the hearing, however, Baker testified that he did not remember any jurors making any comments about religion during the trial, and in particular, any comments about "how those Hebrews stick together." Although he had initially "wondered" about some of the court's rulings, Baker testified that he had not had the impression the judge was favoring any party to the case.

He testified that the defendants' attorneys may have misinterpreted his remarks to them after the trial. On that occasion, Baker said, he had been referring to an incident that occurred in the hallway one morning prior to trial, when he had heard a "testy" attorney say: "What do you have to do to get heard in this court? Do you have to be a Jew or something?" Baker testified that after the incident he asked "some of the rest of them"—jurors apparently—if they had heard the attorney's remark.[2]

R. Jon Foster, an investigator for the defendants, however, cast doubt on Baker's testimony. He testified that when he spoke to Baker prior to the hearing about the remarks he had allegedly made to the defense attorneys, Baker had not denied making the comments, but had said only that his remarks had been "just chitchat and said in confidence."

During the hearing the judge also questioned three other jurors about whether the subject of religion had come up in juror discussions during the trial or whether they had perceived any bias on the part of the court.[3]

One juror, Mrs. Carr, testified that she had perceived no favoritism on the part of the trial judge toward any of the lawyers. She said she did not remember the subject of religion coming up in juror discussions during the trial except on one occasion. On that occasion, early in the trial, she said, fellow juror Adams had asked her if she knew what nationality the judge was. Carr testified that she had replied that, judging from the judge's name, perhaps Jewish.

However, Foster, the investigator, testified that when he talked to Carr prior to the hearing, she had also remembered one other remark being made "in regards to the fact that the attorneys and Judge were Jewish."

Another juror, Ms. Davis, also testified that the subject of religion had not come up in juror discussions during the trial. However, during questioning about whether she had perceived any bias on the judge's part, she testified that she had thought "something was a little funny" because the judge had "tilted" in favor of the defense on some points. And after the trial, she said, she had been told that the judge and defense counsel had practiced law together (a statement that was not true, the judge told Davis).

Finally, juror Adams testified that she thought the judge had been impartial. However, she said that she had heard other jury members make "slurs" against the defense attorneys on two occasions during discussion while the trial was proceeding. At the hearing, she testified that these "slurs" were not of a religious nature. However, Foster, the investigator, testified that Adams had told him prior to the hearing that she had heard "Jewish slurs."

### B.

The evidence concerning the conduct of Adams was largely undisputed. In connec-

---

2. Baker could not identify the attorney who made the remark. He did testify it was not any of the attorneys present at the hearing.

3. The court was scrupulously careful in its questioning of the jurors to make clear that it was not inquiring about comments made in juror deliberations. *See* CRE 606(b).

tion with their post-trial motions, the defendants alleged that Adams had telephoned a synagogue during trial to determine whether defendant Miedema was Jewish and that on the final day of deliberations she had mailed a letter and some religious materials to defendant Miedema, addressed to his son. These religious materials were produced at the hearing. They included a publication from a group called "Jews for Jesus," a publication from the "Faith Prayer & Tract League," a publication of announcements from Redeemer Temple and a Christian board game called "Beat the Devil."[4] Affidavits of defendants' attorneys also alleged that Adams had mailed another letter to Miedema after trial. Also, an affidavit of Donna Miedema, the defendant's wife, alleged that a woman who identified herself as Adams had called and spoke to her on another occasion after trial, asking questions about the personal and business affairs of defendant Miedema, and saying she would pray for the Miedemas.

Carol Hiller, office manager of Temple Micah, testified that she had received an unusual phone call at the synagogue in February of 1985 from an unidentified woman who wanted to know if the name Miedema was a Jewish name. Hiller testified:

I said that I felt there was really no way that you can tell from a name if a person was Jewish or not. And I asked her why she needed to know this.

She then indicated to me that she was a juror. The name she gave me was someone that was being sued and she needed to know if he was Jewish.

I was horrified. I told her that I felt that if she needed to know that, she shouldn't be on a jury. I was getting quite angry on the phone at that time. She—what I said to her didn't change anything about what she wanted to know.

She was very insistent about knowing and asked me if I could tell her where else she could call to get an answer to a question....

Adams testified that she had been the juror who called the synagogue to find out if defendant Miedema was Jewish. She said that she had thought Miedema might be Jewish because of his name and she called the temple because:

I wanted to extend him some real encouragement. And I am a Christian, and I thought if he was Jewish, perhaps he wouldn't like that. But I couldn't find out what he was.[5]

Adams also admitted mailing the letter and religious materials to Miedema and his son. She explained:

I was concerned about that 13 year old boy. And I thought he ought to be thinking more of the ways of the Lord.

---

4. In describing these materials the district court noted: "The religious materials speak for themselves."

> The "Jews for Jesus" publication, in part, says: Y'SHUA (or JESUS if you want to call Him that) said: "SALVATION IS OF THE JEWS...."
> Perhaps you aren't miserable enough to know that you need salvation. If not, wait a while you will be....
> So even if you are a temporarily happy sinner, believe me, or better yet, believe GOD: DUMP THE SIN and GET Y'SHUA. Become part of the important minority who really care. Join the people of GOD.
> The Faith Prayer publication criticizes astrology:
> Turn your back on the satanic world and walk the way of the cross! Don't be concerned about which star you were born un-

der, but whether you are born again into the family of God!
> What sign do you live by? Make it the sign of the cross and join Christians who believe in Jesus, accept His work on the cross, and live by His power....
> The object of the "Beat the Devil" game is to be the first player to reach "glory land." Players are urged to "[u]se the shield of faith to block the fiery darts, the sword of truth to cut through demonic attack as you fight your way out of the bottomless pit."
> On the publication of announcements from Redeemer Temple were the handwritten words, "Inviting you." A schedule of various adult Sunday school classes was also included. Beside a class on "Israel" were the handwritten words, "I attend."

5. According to defendants' attorneys, Miedema was not Jewish.

Then he would understand that we really don't have a fair world....

I can see what an awful judgment was coming on [Miedema] and his family, and I was concerned. I thought these are just earthly matters, and I wanted him to be thinking about being in heaven.

Although her memory was unclear, Adams did not deny that she had mailed the religious materials on the day the verdict was reached (the day they were postmarked, according to the district court). Adams recalled that she had gone out over the noon hour to mail them, after the verdict had been reached (discussion in the record indicates that the verdict was not announced, however, until sometime in the afternoon).

At the conclusion of the hearing, the court found:

Basically this case is a shame. It is really a shame because it was so well tried by counsel and cost so much money....

The jury misconduct in the case is fetid. This trial is fetid. I'm thoroughly disgusted with this jury. I'm ashamed of them.

This is the only jury I have had in almost six years on the bench that I feel ashamed about, and I'm going to issue a separate order to the Jury Commissioner certainly striking [Adams] from the rolls of the jury, because, God forbid, if this should happen to any other litigants, I would feel responsible....

We have essentially a tainted and fetid process mainly due to the problems of [Adams]. I think [Adams] means well. I don't think she harbors any personal bad feeling toward anyone, certainly not toward me or toward the lawyers here. But she is an evangelical person and a religious person; and her conduct, well meaning as it is, is horrifying here. She made remarks about my religion, according to [Carr].... [Adams] mails religious materials to Mr. Miedema's family member during lunch before the verdict comes in. She brought it with her before the jury deliberated. She carried it to

the courthouse, possessed it, deliberated, mailed it before the verdict came in. The religious materials speak for themselves.

She was obsessed with Mr. Miedema's religious beliefs to the point where in the middle of trial, she calls a synagogue to inquire about Mr. Miedema's beliefs. Ironically, Mr. Miedema isn't Jewish. He's a Christian. But who can say here what effect that [Adams'] obsession with Mr. Miedema's religious beliefs had, especially because he is the, shall we say, all-out loser in this event....

In any event, the appearance of impropriety in a juror calling a synagogue to inquire about a litigant's religious belief is awesome; and to ignore it would be to say to the community this is something that is to be tolerated in the court system, and that can't be done....

In any case, I don't think she meant any harm, but I don't think that [Adams] had the requisite mental state to be a juror in this case....

In further findings, the court concluded that juror Baker had made the remarks that the defense attorneys had said he had about "the Hebrew thing." The court further found that Adams had said she had heard jury members making "Jewish slurs."

With respect to the error in scheduling the hearing on the new-trial motion past the deadline for the court to make a determination under C.R.C.P. 59(j), the court said:

I think it's the Court's fault. I don't think it's counsels' fault particularly. We set it routinely and didn't give it any thought. It wasn't brought to our attention that it had to be set any earlier, and it wasn't. And there are a lot of counsel pulled together on this matter. So it got set when it got set. I was not aware, frankly, that there was any time problem. So that's what happened.

C.R.C.P. 59(j) was a newly enacted rule at the time of this trial; it became effective January 1, 1985, just prior to the trial.

## III.

■ Proceedings under C.A.R. 21 are authorized to consider whether a district court is acting without or in excess of its jurisdiction or to review a serious abuse of discretion where an appellate remedy would not be adequate. *Halliburton v. County Court,* 672 P.2d 1006, 1009 (Colo. 1983). Petitioners here argue that the district court had no jurisdiction under C.R. C.P. 59 to grant a new trial or under C.R. C.P. 60 to set aside the judgment and, even if it did, the court abused its discretion in setting aside the judgment.

■ Petitioners first contend that by October 10, 1985, the date of the hearing, the district court had lost jurisdiction to rule on the defendants' motion for a new trial under C.R.C.P. 59. We agree.

C.R.C.P. 59(j) provides:

The court shall determine any post-trial motion within 60 days of the date of the filing of the motion.... Any post-trial motion that has not been decided within the 60–day determination period shall, without further action by the court, be deemed denied for all purposes including Rule 4(a) of the Colorado Appellate Rules and time for appeal shall commence as of that date.

Here, the defendants' motion for new trial was filed April 26, 1985. Thus, the 60–day period elapsed on June 26. However, on June 19, the court scheduled a hearing on defendants' motion for August 21—after the deadline. The defendants initially contended below that the rule should be read to provide for automatic denial of a new-trial motion only "without further action by the court," meaning only when the district court has taken no further action in the prescribed 60–day period. In this case, they argued that the district court had taken "further action" by scheduling the hearing during that period. However, the district court rejected that argument, and we agree. C.R.C.P. 59(j) was enacted to eliminate the problem of post-trial delay at the trial court level prior to appellate proceedings. If trial courts could forestall the 60–day deadline by merely taking some in-

conclusive action, the purpose of the rule would largely be defeated.

Defendants now argue that the district court retained jurisdiction over the new-trial motion under the "unique circumstances" doctrine we adopted in *Converse v. Zinke,* 635 P.2d 882 (Colo.1981). We disagree. In *Converse,* we held that a court may retain jurisdiction over a post-trial motion even if the motion is filed late in the "unique circumstances" where the party filing the motion reasonably relied and acted upon an erroneous or misleading statement or ruling by the trial court regarding the time for filing the motion. We decline to extend that doctrine to the time for determination of a new-trial motion pursuant to C.R.C.P. 59. We note first that the language of C.R.C.P. 59(j) is mandatory; it provides that the district court "shall" rule within 60 days or the motion "shall" be automatically denied. Further, under C.R. C.P. 6(b), a district court "may not extend the time for taking any action under Rules 59 and 60(b), except to the extent and under the conditions therein stated." In the face of this clear language and in light of the purpose of C.R.C.P. 59(j), we decline to apply the *Converse* rule here.

## IV.

Next, the petitioners argue that the court had no jurisdiction under C.R.C.P. 60 to consider defendants' motion based on jury misconduct because such an interpretation of C.R.C.P. 60 would undercut the purpose of C.R.C.P. 59(j) by permitting litigants to evade the time limits of that rule.

■ We disagree. While we agree that C.R.C.P. 60 should not be used to circumvent C.R.C.P. 59, we perceive no threat to the integrity of C.R.C.P. 59 by the action taken by the district court in light of the facts of this case.

The issue here, as we perceive it, is the proper scope of C.R.C.P. 60(b). In construing the rule, we look to its purpose. *Patterson v. Cronin,* 650 P.2d 531, 534 (Colo. 1982).

C.R.C.P. 60(b), like its counterpart in the Federal Rules of Civil Procedure, "attempts to strike a proper balance between the conflicting principles that litigation must be brought to an end and that justice should be done." 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2851, at 140 (1973).[6] To achieve this balance, the rule specifies a number of situations in which post-judgment relief may be warranted and also provides in clause 60(b)(5) that courts may set aside a judgment for "any other reason justifying relief from the operation of the judgment."[7] In *Klapprott v. United States*, 335 U.S. 601, 614–15, 69 S.Ct. 384, 390, 93 L.Ed. 266, *modified*, 336 U.S. 942, 69 S.Ct. 384, 93 L.Ed. 266 (1949), the Supreme Court noted that, "In simple English, the language of the 'other reason' clause, for all reasons except [those] particularly specified, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." Read that broadly, however, the "other reason" clause could create too much uncertainty surrounding the validity of judgments. For that reason, we have more narrowly interpreted the clause to avoid undercutting judgments unduly, *Cavanaugh v. Department of Social Services*, 644 P.2d 1, 5 (Colo.), *appeal dismissed*, 459 U.S. 1011, 103 S.Ct. 367, 74 L.Ed.2d 504 (1982); and we have insisted that it be reserved for "extraordinary circumstances," *Cavanaugh*, 644 P.2d at 5, and "extreme situations." *Atlas Construction Co. v. District Court*, 197 Colo. 66, 69, 589 P.2d 953, 956 (1979).

While we have never definitively delineated the scope of the extraordinary circumstances required for relief under the "other reason" clause, we believe the facts of this case—involving grievous jury misconduct raising sensitive issues of religion—present extraordinary circumstances. While C.R.C.P. 60(b)(5) should be applied with care, it still must be applied in light of its original equitable purposes when extreme situations arise. *See, i.e., Klapprott v. United States*, 335 U.S. 601, 614–15, 69 S.Ct. 384, 390, 93 L.Ed. 266, *modified*, 336 U.S. 942, 69 S.Ct. 384, 93 L.Ed. 266 (1949).

We are not the first to find that jury misconduct in an appropriate case presents grounds for relief under the "other reason" clause of C.R.C.P. 60(b). *See Consolidated Gas & Equipment Co. v. Carver*, 257 F.2d 111 (10th Cir.1958). We believe jury misconduct—like fraud, which is an enumerated ground for relief under C.R.C.P. 60(b)—can strike at the very legitimacy of judicial proceedings and public confidence in our system of justice. We have emphasized before that stringent rules to prevent jury misconduct arise from "the necessity of keeping the administration of justice pure and free from all suspicion of corrupting practices." *Butters v. Dee Wann*, 147 Colo. 352, 357, 363 P.2d 494, 497 (1961).

Petitioners argue, however, that the defendants were not justified in seeking relief under C.R.C.P. 60(b)(5) because they failed to appeal, without explanation, the automatic denial of their new-trial motion. We disagree. In our view, this case is not

6. Fed.R.Civ.P. 60(b) differs in some minor respects from C.R.C.P. 60(b). For instance, the federal rule enumerates "newly discovered evidence" as a ground for relief while Colorado does not. For that reason, the federal "other reason" clause is 60(b)(6) whereas in Colorado it is 60(b)(5). Also, the time limits for relief under 60(b)(1) and (2) in Colorado are not more than six months after judgment whereas the federal rule limits relief to not more than one year after judgment for the same grounds.

7. C.R.C.P. 60(b) provides in part:
  On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) Mistake, inadvertence, surprise, or excusable neglect; (2) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (3) the judgment is void; (4) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (5) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1) and (2) not more than six months after the judgment, order, or proceeding was entered or taken....

analogous to those in which a party sought relief from a judgment after making a "free, calculated, deliberate" choice not to appeal. *Ackermann v. United States,* 340 U.S. 193, 198, 71 S.Ct. 209, 95 L.Ed. 207 (1950); *Cavanaugh v. Department of Social Services,* 644 P.2d 1, 5 n. 7 (Colo.), *appeal dismissed,* 459 U.S. 1011, 103 S.Ct. 367, 74 L.Ed.2d 504 (1982). *Compare Tyler v. Adams County Department of Social Services,* 697 P.2d 29 (Colo.1985).[8]

Petitioner Theleen contends this is a case of "mistake" under clause (b)(1) of C.R.C.P. 60 rather than a case of "other reasons" under clause (b)(5). Since relief from judgment due to "mistake" must be sought within six months of judgment under the rule, the defendants would be barred from relief with respect to Theleen if we were to adopt that view.[9] We decline to adopt that view.

Even assuming the defendants may have failed to appeal due to a mistake on their part, we believe serious jury misconduct more properly falls within the "other reason" clause of C.R.C.P. 60. As we have said, important public policies are at stake in jury misconduct cases and the mistakes of a party should not necessarily bar relief if the misconduct is extraordinary. *Compare Atlas Construction Co. v. District Court,* 197 Colo. 66, 589 P.2d 953 (1979) *with In re Marriage of Seely,* 689 P.2d 1154 (Colo.App.1984). We note by analogy that under the rule, fraud is a ground for relief independent of "mistake" as well.

At bottom, we believe that when a district court finds jury misconduct that is

"awesome" and "horrifying," that renders the process "fetid" and the case a "shame," the court has ample powers under clause (5) of C.R.C.P. 60(b) to set aside the judgment without unduly expanding the contours of the rule or undercutting the beneficial purposes of C.R.C.P. 59(j). We conclude, therefore, that the district court had jurisdiction under C.R.C.P. 60(b)(5) to set aside petitioners' judgment.

V.

Even if the district court properly inquired into the jury misconduct in this case, petitioners argue, the court abused its discretion in granting relief on the evidence presented.

First, petitioners assert that several key findings of the district court were based on inadmissible hearsay evidence. They point in particular to the affidavits of the defendants' attorneys which quote juror Baker as telling the attorneys what other jurors had said about "the Hebrew thing." In addition, they point to the testimony of Foster, the investigator, as to statements made by the jurors in his conversations with them. *See* CRE 801(d)(1)(A).

Second, petitioners contend that the affidavits of defense counsel were insufficient as a matter of law to justify setting aside the jury's verdict. *See Aldrich v. District Court,* 714 P.2d 1321 (Colo.1986); *Hansen v. Dillon,* 156 Colo. 396, 400 P.2d 201 (1965).

■ Assuming, *arguendo,* that petitioners are correct on these points, their argument that the district court abused its discretion still must fail.[10] Even without this

---

**8.** Assuming defendants' new-trial motion was automatically deemed denied on June 26, the last possible day they could have appealed this denial was September 9. *See* C.A.R. 4(a) (45 days to file notice of appeal; 30–day extension possible on showing of excusable neglect). Petitioner Canton waited until September 10th to file its motion based on C.R.C.P. 59(j), and Theleen filed shortly thereafter.

**9.** Theleen's judgment was entered February 28, 1985. Canton's judgment was entered April 5, 1985. Defendants' C.R.C.P. 60(b) motion was filed October 2, 1985, more than six months

after entry of Theleen's judgment but within six months of Canton's judgment. Under the "other reason" clause of C.R.C.P. 60(b), relief must be sought within a "reasonable time." The district court found the time was reasonable here.

**10.** Under CRE 801(d)(1)(A), prior inconsistent statements of testifying witnesses are "not hearsay," and thus are admissible for the truth of what they contain, if the declarant is "subject to cross-examination concerning the statement." Here, the judge questioned the jurors, but allowed attorneys on both sides to submit questions for her to ask. Because of our disposition

evidence, the court could have relied solely on other evidence in the record including the testimony of Adams, the testimony of Hiller from the synagogue and the religious materials placed in evidence. It appears from the judge's findings that the court in fact relied primarily on this evidence—the evidence relating to the conduct of Adams and the influence of religious matters upon her—which was largely undisputed. Based on this evidence, alone, we believe the trial court could have properly set aside the judgment without abusing its discretion. *See Butters v. Dee Wann*, 147 Colo. 352, 363 P.2d 494 (1961); *People v. Borrelli*, 624 P.2d 900 (Colo.App. 1980).

## VI.

Petitioners next contend that the trial court abused its discretion in setting aside the judgment pursuant to C.R.C.P. 60(b)(5) because the court, itself, found that the jury's misconduct was harmless. In support of this argument petitioners rely on C.R.C.P. 61, which requires courts to disregard errors not affecting "the substantial rights of the parties." They point to the statement of the district court that:

I think and honestly believe that if we had had a decent jury that the result would have been exactly the same.

■ However, a fair reading of the trial court's findings indicates to us that the court never held the error was "harmless." Immediately after the statement cited by the petitioners the district court also said:

But we simply cannot have trials like this. I could never stand by or sit by and let a trial like this occur and not do something about it, and so the motion is granted....

The court's written order also stated that relief from the judgment was necessary "to avoid a manifest injustice." We think it goes almost without saying that the right to an impartial jury's deciding a case on the evidence presented at trial is a "substantial right" under C.R.C.P. 61 and otherwise,

and the district court properly recognized that fact.

In *Butters v. Dee Wann*, 147 Colo. 352, 363 P.2d 494 (1961), for instance, we were faced with another case in which a juror decided to undertake some independent investigation of inadmissible matters. There we concluded:

To condone this juror's misconduct and to assume that his mind was uninfluenced by the extrajudicial investigation of incompetent inadmissible matters, finds no sanction in the law. Such conduct deprives plaintiff of the fair and impartial trial to which every litigant under our law is entitled.

*Butters*, 147 Colo. at 358, 363 P.2d at 497. We find no merit in the petitioners' argument.

## VII.

Additionally, petitioners assert that the district court abused its discretion in setting aside the judgment because it made no finding that the jurors' conduct in this case had a capacity to influence the verdict. We disagree.

■ Petitioners correctly state the legal standard for determining when jury misconduct warrants a new trial. In *Butters*, we stated:

It is well settled that the test for determining whether a new trial will be granted because of the misconduct of jurors or the intrusion of irregular influences is whether such matters could have a tendency to influence the jury in arriving at its verdict in a manner inconsistent with the legal proofs and the court's charge. If the irregular matter has that tendency on the face of it, a new trial should be granted without further inquiry as to its actual effect. *The test is not whether the irregular matter actually influenced the result, but whether it had the capacity of doing so.*

*Butters*, 147 Colo. at 357, 363 P.2d at 497 (emphasis in original). *See also Aldrich v.*

of this case, we need not now decide whether this would be considered sufficient "cross-exam-

ination" under the rule to allow substantive use of prior inconsistent statements.

*District Court,* 714 P.2d 1321, 1325 n. 2 (Colo.1986).

■ Here, we believe the trial court, implicitly at least, made the necessary finding that the jurors' conduct had the "capacity" of influencing the verdict. While the trial court personally expressed the belief that the verdict would have been the same with a "decent" jury, the court recognized that the misconduct here could have had an effect on the verdict even though the court could not adequately gauge that effect. At one point, for instance, the court said:

> [Adams] mails religious materials to Mr. Miedema's family member during lunch before the verdict comes in. She brought it with her before the jury deliberated. She carried it to the courthouse, possessed it, deliberated, mailed it before the verdict came in. The religious materials speak for themselves.
>
> She was obsessed with Mr. Miedema's religious beliefs to the point where in the middle of trial, she calls a synagogue to inquire about Mr. Miedema's beliefs. Ironically, Mr. Miedema isn't Jewish. He's a Christian. But who can say what effect that [her] obsession with Mr. Miedema's religious beliefs had, especially because he is the, shall we say, all-out loser in this event.

From this we conclude that the trial court found that the conduct of Adams, at least, had the capacity of influencing the verdict.

## VIII.

Lastly, petitioners contend that the conduct of Adams, although unusual, does not translate into any supportable conclusion of prejudice. They assert that her conduct was "well-meaning" and motivated only by a concern for defendant Miedema's well-being and a desire to extend him "Christian" comfort. We cannot accept this argument.

Petitioners essentially are asking that an inquiry be made into the actual influence that the misconduct had. As we noted in *Butters,* the trial court was not required to find any actual influence on the verdict by the conduct in question. We believe the

district court did not abuse its discretion here in finding that the conduct in question had a capacity to influence the verdict.

The rule is discharged.

ERICKSON, J., dissents, and VOLLACK, J., joins in the dissent.

DUBOFSKY, J., does not participate.

ERICKSON, Justice, dissenting:

I respectfully dissent. In my view, the trial court abused its discretion by vacating the petitioner's judgment pursuant to C.R. C.P. 60(b)(5). Rule 60(b)(5) provides extraordinary relief and may be invoked only upon a showing of exceptional circumstances. *Cavanaugh v. Department of Social Services,* 644 P.2d 1, 5 (Colo.1982); *Stradley v. Cortez,* 518 F.2d 488, 494 (3rd Cir. 1975). In *Cavanaugh,* we recognized that Rule 60(b)(5) is not a substitute for appeal, and that the movant's failure to appeal when appeal is an adequate remedy precludes relief under Rule 60:

> Rule 60 also contains a residuary clause which allows relief from judgment for "any other reason justifying relief from the operation of the judgment," in addition to those specifically enumerated in other subsections of the rule.... However, even the expansive "any other reason" language has been narrowly interpreted so as to avoid undercutting the preferred rule of finality of judgments. Rule 60 is not a substitute for appeal, but instead is meant to provide relief in the interests of justice in extraordinary circumstances.
>
> The failure to timely file an appeal has been held not to be a sufficient ground to justify extraordinary relief from judgment. Appellant's failure to perfect an appeal from the earlier proceeding does not present a sufficient factual basis to warrant extraordinary relief.

644 P.2d at 5 (citations omitted).

In this case, the defendants did not demonstrate that the automatic denial of their motion for a new trial caused appellate review to be an inadequate remedy, and the

defendants have not established that exceptional circumstances warranted setting aside the judgment against them. The denial of a motion for a new trial as a result of time limitations in the rule is no different than denial after a hearing. Denial of the motion for a new trial permits appeal of the issues raised in the motion without further delay. The majority opinion, which allows the trial court to vacate a judgment under Rule 60(b)(5) upon proof of "awesome" and "horrifying" juror misconduct that renders the process "fetid" and the case a "shame," provides no guidance to the courts below on the standard that should be applied when a Rule 60(b)(5) motion is filed, and permits Rule 60(b)(5) to be used in many instances as a means for circumventing C.R.C.P. 59.

The trial court also erred in granting the defendants' motion to vacate because, as the trial court stated, "the result [in this case] would have been exactly the same" in the absence of juror misconduct. The majority recognizes that the trial court must disregard errors that do not affect "the substantial rights of the parties," *see* C.R.C.P. 61, but declares, "it goes almost without saying that the right to an impartial jury deciding a case on the evidence presented at trial is a 'substantial right' under C.R.C.P. 61 and otherwise...." In my view, the majority considers only part of the test set forth in Rule 61. It is indisputable that the defendants' right to an impartial jury is a "substantial right" under Rule 61. However, regardless of the sanctity of the defendants' right to an impartial jury, the defendants must prove that juror misconduct *affected* that right. The trial court found, and the record supports the court's finding, that the actions of Ms. Adams and others did not prejudice the defendants.[1] I do not believe that Rule 61 supports the majority's conclusion that prejudice exists because of the right allegedly affected, and nothing more. If that interpretation of Rule 61 were correct, ju-

ror misconduct, errors in the admission of evidence, errors in instruction given to the jury, restrictions on cross-examination, and prosecutorial misconduct could never be harmless error because the rights allegedly affected are "substantial." The law is clear that such errors may be harmless, as I conclude the errors were in this case. *See* 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2885–88 (1973 & 1986 Supp.).

Accordingly, I would make the rule absolute.

I am authorized to say that Justice VOLLACK joins in this dissent.

---

1. Unlike the majority, I do not believe that the court's statements, "we simply can't have trial like this" and "the motion under C.R.C.P. 60(b)(5) ... must be granted to avoid manifest injustice," overcome the trial judge's belief that the verdict would not have been different in the absence of juror misconduct.