The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
DECEMBER 13, 2018

## 2018COA178

**No. 17CA2126, *People in Interest of M.H-K.* — Juvenile Court — Dependency and Neglect — Civil Jury Instructions — Introductory Remarks to Jury Panel**

In this dependency and neglect proceeding, a division of the court of appeals holds that the juvenile court erred by incorporating the entire petition in dependency and neglect into its statement-of-the-case instruction under CJI-Civ. 41:1. The statement of the case instruction should be a short, non-argumentative summary of the Department's claims. But the juvenile court's instruction recited the history of the case from the perspective of the Department, including prejudicial inferences, references to inadmissible evidence, and allegations that were not proven at trial. Because the error was not harmless, the division reverses the judgment of adjudication and remands for a new trial.

Additionally, because the issue may arise on remand, the division holds that the juvenile court also erred in admitting evidence of mother's refusal to submit herself and the child to voluntary drug testing before the Department filed its petition.

Court of Appeals No. 17CA2126
City and County of Denver Juvenile Court No. 17JV1190
Honorable Laurie A. Clark, Judge

The People of the State of Colorado,

Petitioner-Appellee,

In the Interest of M.H-K., a Child,

and Concerning S.K. and M.C.H.,

Respondents-Appellants.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE HARRIS
Webb and Welling, JJ., concur

Announced December 13, 2018

Kristin M. Bronson, City Attorney, Brian P. Fields, Assistant City Attorney, Denver, Colorado, for Petitioner-Appellee

Barry Meinster, Guardian Ad Litem

The Morgan Law Office, Kris P. Morgan, Colorado Springs, Colorado, for Respondent-Appellant S.K.

Melanie Jordan, Respondent Parent's Counsel, Denver, Colorado, for Respondent-Appellant M.C.H.

¶ 1     Mother, S.K., and father, M.C.H., appeal the judgment of adjudication that the juvenile court entered after a jury found their infant son, M.H-K., dependent and neglected.

¶ 2     The parents raise several contentions of error.  We need address only two.  We conclude that the juvenile court erred by incorporating the detailed allegations of the petition in dependency and neglect into its statement-of-the-case instruction to the jury and by admitting evidence that mother refused to submit herself and her child to drug testing before the petition had been filed.

¶ 3     Because the errors are not harmless, we reverse the judgment and remand the case for a new trial.

## I.     Background

¶ 4     The child weighed approximately seven pounds at birth, but he lost twelve percent of his birthweight in the next three days.  The hospital social worker had concerns that the baby (who was breastfeeding) was not being fed enough, that the parents were not sufficiently "responsive to advice or information that hospital personnel were providing" to them, and that "perhaps substance use was going on."  Her "greatest concern," however, was that, while "typical first-time mother[s]" tend to "ask[] a lot of questions and

[are] nervous about the care of a baby," she "didn't see evidence of that" with mother. Based on these concerns, the hospital social worker reported the family to the Denver Department of Human Services (the Department). The Department was also informed that mother had refused to allow the hospital to test her or the child for drugs.

¶ 5 Around the same time, the Department received a second referral, from an unknown source, stating that mother and father might be using methamphetamine.

¶ 6 Upon receipt of the referrals, a caseworker visited the family at their pop-up camper. The child was six days old.

¶ 7 The visit went badly. The caseworker asked both parents to submit to drug testing, and she asked mother to stop breastfeeding the child until mother could show that she was not using controlled substances. Both parents refused. The caseworker later described mother's reaction as "escalated" and father's as "escalated," "hostile," and "volatile."

¶ 8 The caseworker believed that the child's environment was unsafe because she could not determine whether the parents were using controlled substances and because the parents had been

"hostile and volatile" in their interactions with her. As a result, she obtained a "judge's hold" granting the Department custody of the child and immediately removed him from the home.

¶ 9　　Two days later, the Department filed a petition in dependency and neglect. The petition contained a detailed case history, including a summary of the referrals that prompted the Department's action and a description of the caseworker's encounter with the parents and the removal of the child.

¶ 10　　At the Department's request, a magistrate ordered the parents to submit to sobriety monitoring. The magistrate ruled that the tests were for safety purposes and their results would not be admissible at the parents' adjudicatory trial.

¶ 11　　Shortly before the trial, the Department amended the case history portion of the petition. It added information that included the dates the parents had missed court-ordered drug tests and the results of the tests they had taken.[1]

---

[1] According to the amended petition, mother submitted to urinalysis the day after the Department removed the child from the home. The test results were negative for all substances.

3

¶ 12    At the beginning of the adjudicatory trial, as part of its statement of the case instruction, the juvenile court read the entire amended case history portion of the petition to the venire.  Later, the court also admitted evidence that mother had declined requests for drug testing before the Department had even filed the petition.

¶ 13    The jury determined that the child was dependent and neglected because his environment was injurious to his welfare, he was lacking proper parental care, and his parents had failed or refused to provide proper or necessary subsistence, education, medical care, or other care.  *See* § 19-3-102(1)(b)-(d), C.R.S. 2018.

II.    Legal Principles Related to Adjudicatory Proceedings

¶ 14    Parents have a fundamental liberty interest in the care, custody, and management of their children.  *People in Interest of J.G.*, 2016 CO 39, ¶ 20.  The purpose of the adjudicative process is to determine whether the factual allegations in a dependency and neglect petition are supported by a preponderance of the evidence so as to warrant intrusive state intervention into the familial relationship.  *Id.* at ¶ 18.  Adjudication vests the court with extensive dispositional remedies and opens the door to termination

of parental rights.  *People in Interest of A.M.D.*, 648 P.2d 625, 639 (Colo. 1982).

¶ 15    Thus, "[e]nsuring a fair procedure at the adjudicatory stage is critical."  *People in Interest of J.W.*, 2016 COA 125, ¶¶ 20-21, *rev'd on other grounds sub nom. People in Interest of J.W. v. C.O.*, 2017 CO 105, ¶¶ 20-21; *see also A.M.D.*, 648 P.2d at 639.  "The importance of the adjudicatory stage is reflected in the fact that a parent has a statutory right to a jury trial on the allegations set forth in the petition in dependency or neglect."  *J.W.*, ¶ 22.  Of course, the right to have an impartial jury decide a case on the evidence presented at trial is a "substantial right" under C.R.C.P. 61.  *Canton Oil Corp. v. Dist. Court*, 731 P.2d 687, 696 (Colo. 1987).

III.    The Juvenile Court's Statement of the Case Instruction

¶ 16    Father contends that the juvenile court committed reversible error when it incorporated the case history portion of the petition into its statement of the case instruction to prospective jurors.  We agree.  We further conclude that the error requires reversal because it impaired the basic fairness of the trial.

## A.     Standard of Review and Preservation

¶ 17     A trial court must correctly instruct the jury on applicable law, but it retains substantial discretion over the form and style of jury instructions. *Townsend v. People*, 252 P.3d 1108, 1111 (Colo. 2011). Accordingly, we review legal conclusions implicit in jury instructions de novo, but review issues of form and style for an abuse of discretion. *Id.* We conclude, and the parties agree, that the juvenile court's formulation of the statement of the case instruction is an issue of form and style and is therefore reviewed under the abuse of discretion standard. A trial court abuses its discretion when it instructs a jury in a way that is manifestly arbitrary, unreasonable, or unfair, *J.G.*, ¶ 33, or when it misconstrues the law, including a rule of procedure, *see People v. Ehrnstein*, 2018 CO 40, ¶ 13.

¶ 18     Both parents objected to the juvenile court reading the case history portion of the petition to the jury. The Department and the guardian ad litem acknowledge the parents' objection, but they nonetheless contend that the parents invited any error by failing to tender an alternate instruction. That contention misses the mark.

¶ 19    The invited error doctrine encapsulates the principle that "a party may not complain on appeal of an error that he has invited or injected into the case[.]" *Horton v. Suthers*, 43 P.3d 611, 618 (Colo. 2002) (quoting *People v. Zapata*, 779 P.2d 1307, 1309 (Colo. 1989)). The doctrine prevents a party from inducing an inappropriate or erroneous ruling and then later seeking to profit from that error. *Id.*

¶ 20    Here, for example, if the parents had requested that the juvenile court read the entire petition as its introductory instruction, they would be barred by the invited error doctrine from complaining on appeal that the court had read the petition. *See Zapata*, 779 P.2d at 1309. But the parents did not ask the court to read the petition; they asked the court not to read the petition. And the court denied their request. Accordingly, we conclude that the invited error doctrine does not apply and that the parents have preserved the issue for review.

¶ 21    In a civil case, a properly preserved objection to an instruction is subject to review for harmless error. *Gasteazoro v. Catholic Health Initiatives Colo.*, 2014 COA 134, ¶ 12. Under this standard, reversal is required only if the error prejudiced a party's substantial

rights.  *McLaughlin v. BNSF Ry. Co.*, 2012 COA 92, ¶ 32; *see also* C.R.C.P. 61.  "An error affects a substantial right only if 'it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself.'"  *Bly v. Story*, 241 P.3d 529, 535 (Colo. 2010) (quoting *Banek v. Thomas*, 733 P.2d 1171, 1178-79 (Colo. 1986)).

## B.  Applicable Law: C.R.C.P. 47 and Relevant Pattern Jury Instructions

¶ 22    To facilitate the jury selection process, at the outset of a case the district court must orient prospective jurors to the proceedings and inform them about their duties and service.  C.R.C.P. 47.  As part of this orientation, the court must explain the nature of the case, in plain and clear language, using either "the parties' [pattern jury instruction]" or "a joint statement of factual information intended to provide a relevant context for the prospective jurors to respond to questions asked of them."  C.R.C.P. 47(a)(2)(IV); *see also* C.R.C.P. 16(g) ("Counsel for the parties shall confer to develop jointly proposed jury instructions and verdict forms to which the parties agree.").  Upon request, the court may allow counsel to "present such information through brief non-argumentative

statements." C.R.C.P. 47(a)(2)(IV). "The imparted information and instructions should be clear and as neutral as possible." C.R.C.P. 47 cmt.

¶ 23  C.R.C.P. 47(a)(2)(IV) directs courts to use CJI-Civ. 2:1 (2018) to effectuate Rule 47. Pattern Instruction 2:1, in turn, instructs that, in dependency and neglect cases, chapter 41's pattern jury instructions apply. *See* CJI-Civ. 2:1 notes on use 6.

¶ 24  Pattern Civil Jury Instruction 41:1, Introductory Remarks to Jury Panel, establishes a model instruction for an introductory statement of the case instruction for the jury panel. *See* CJI-Civ. 41:1 source and authority (2018). As relevant here, the pattern instruction reads as follows:

> The case is based upon a petition that claims: *(insert the relevant portions of the petition).*
>
> You should understand that these are only claims and that you should not consider the claims as evidence in the case.
>
> The respondent(s) (has) (have) denied the claims made in the petition. The Petitioner has the burden of proving the facts claimed in the petition by a preponderance of the evidence. The purpose of this trial is to determine whether the claims made in the petition are true.

9

*Id.* (italics in original).

¶ 25    Pattern Civil Jury Instruction 41:4 models a statement of the case instruction that courts may provide after the close of evidence. It reads, in relevant part as follows:

> The petitioner claims that *(name of child)* is dependent and neglected because: *(insert those allegations from the petition on which sufficient evidence has been introduced and which if established would constitute a legal basis for determining that the child is dependent and neglected).*
>
> The respondent(s), *(name[s]),* (has) (have) denied these claims.
>
> The guardian ad litem, *(name),* claims *(insert appropriate description of the guardian's position).*
>
> These are the issues you are to determine, but are not to be considered by you as evidence in the case (except for those facts which have been admitted or agreed to).

CJI-Civ. 41:4 (2018) (italics in original).

### C.    The Juvenile Court Erred in Instructing the Jury[2]

#### 1.    The Juvenile Court's Instruction

---

[2] Neither the Department nor the guardian ad litem argues that the instruction was proper.

¶ 26    The parties did not submit a jointly prepared CJI-Civ. 41:1 instruction or joint statement of factual information for the court to include in its introductory remarks to prospective jurors.  In accordance with CJI-Civ. 41:1, the court began with an introduction of the parties and an explanation regarding their role in the case.  From there, the pattern instruction directs the court to explain that "[t]he case is based upon a petition that claims (insert the relevant portions of the petition)."  CJI-Civ. 41:1 (2018).  Rather than inserting the statutory grounds for the petition, with some limited factual explanation of those grounds, the court announced, "[t]he case is based on a Petition, and I'm going to read you the contents of that Petition."

¶ 27    The court then recited the entire 900-word amended case history — a portion of the petition identified as "[t]he facts, based on information and belief, which bring said children [sic] within the jurisdiction of the [c]ourt."  The Department was not identified as the declarant, although some statements were attributed to the caseworker.

¶ 28    By doing so, the court read a play-by-play account of the Department's interactions with the family in the days and weeks

11

after the child's birth.  It recounted in detail the caseworker's description of the parents' conduct when she contacted the family six days after the child's birth, including statements that the parents were "volatile," "escalated," and "aggressive."  The court recited allegations that the parents were "uncooperative" and had refused drug testing; mother had dark, fresh bruises on the insides of her arms; mother had refused to stop breastfeeding pending a drug test that would verify she did not have marijuana in her system; the parents had refused a safety plan to ensure a sober caregiver for the child; the caseworker had called the police because she was "in fear of the family fleeing with the child"; the Department had obtained a judge's hold; and the Department had been granted custody of the child.

¶ 29    The case history the court read also contained specific information about drug testing: dates when the parents agreed or refused to submit to testing, the number of tests they missed or completed, and the test results.  The descriptions included creatinine levels and statements that the Department had "determined" that mother's dilute urine samples — which, by

definition, do not establish the presence of a controlled substance — were positive for controlled substances.

¶ 30    The court also read an unattributed assertion that mother had "admitted knowing that [father] was using methamphetamine while caring for the[] child, but fail[ed] to recognize the impact on the child when [father] [was] under the influence of substances."

¶ 31    The court then instructed the prospective jurors as follows: "You should understand that these are only claims, and you should not consider the claims as evidence in this case. [Mother] and [father] have denied the claims in the [p]etition."

¶ 32    The court's instruction did not explain the reason for the instruction in the first place — to inform the jury that it had to determine whether the Department had proved a statutory basis for finding the child dependent and neglected. The court's instruction did not mention the term "dependent and neglected" or any statutory basis for such a finding. To the contrary, the petition listed every possible statutory ground for adjudication under section 19-3-102(1), including some that could not possibly have applied to this case. *See, e.g.,* § 19-3-102(1)(f) (child beyond control of parent); § 19-3-102(1)(g) (child tests positive at birth for

13

controlled substance).  Consequently, to what extent this information would have helped the prospective jurors understand the issues before them is at best debatable.

### 2. The Instruction Was Not a Proper CJI-Civ. 41:1 Introductory Statement of the Case Instruction

¶ 33    As we have said, the purpose of the introductory statement of the case instruction is simply to orient the jury to the nature of the case as a way of facilitating the jury selection process.  The juvenile court's instruction departed from this limited purpose.

¶ 34    Contrary to the directives of C.R.C.P. 47(a)(2)(IV), the juvenile court's introductory instruction did not derive from a jointly prepared statement or consensus of the parties.  It did not constitute "brief, non-argumentative statements" by counsel.  And it did not otherwise impart the essential information about the case in a "neutral" manner.

¶ 35    Instead, the court's instruction amounted to a judicially endorsed opening statement on behalf of the Department.  Even more troubling, the court did not couch the assertions in terms of what the evidence would show and did not limit the assertions to evidence the Department was prepared to present.

14

¶ 36    The juvenile court's instruction reflects a procedure long

recognized as problematic.

> In historic practice, the issues were often
> stated in an instruction which elaborately
> informed the jury of the allegations of the
> parties, using the legal verbosity of the
> pleadings. *One frequent objective of a lengthy*
> *pleading was to enlist the office of the trial*
> *judge in arguing the case to the jury, in the*
> *guise of an issue instruction based on such*
> *pleading.* It is not good practice, and may be
> reversible error, for a judge to read complex
> pleadings to the jury.

6 Am. Jur. *Trials* 923, § 12, Westlaw (database updated Nov. 2018)

(emphasis added).

¶ 37    That CJI-Civ. 41:1 was not intended to serve as one party's

court-sponsored theory of the case instruction is confirmed by other

pattern instructions designed to implement the objectives of Rule

47.  CJI-Civ. 2:1, for example, explains that the statement of the

case instruction should use "simple language" to "briefly" describe

the parties' positions, stating only "the essential elements of the

claim[s]" and defenses.  Similarly, COLJI-Crim. B:01 (2017), which

is derived from Crim. P. 24(a)(2)(v) (the counterpart to C.R.C.P. 47),

directs the court to summarize the charges set forth in the

information, complaint, or indictment.  That instruction makes

15

clear the court should read only a short statement of the elements of the offense, rather than a detailed exposition of the circumstances surrounding the defendant's alleged commission, and the police investigation, of the crime. But here, the juvenile court chose the latter, impermissible approach, reading the functional equivalent of an arrest warrant affidavit to the jury. *See, e.g., Reid v. Pyle*, 51 P.3d 1064, 1069 (Colo. App. 2002) (affidavit of probable cause for the defendant's arrest was not admissible in civil trial); *see also Lamar v. State*, 578 So. 2d 1382, 1389 (Ala. Crim. App. 1991) (affidavits in support of arrest warrants are generally inadmissible at trial).

¶ 38    Thus, the juvenile court's instruction was not a proper implementation of introductory remarks to the jury panel in keeping with CJI-Civ. 41:1.

### 3.    The Instruction Was Not a Proper CJI-Civ. 41:4 Statement of the Case

¶ 39    Although the parties discussed the proposed instruction in the context of CJI-Civ. 41:4, we are not convinced that CJI-Civ. 41:4 applies at the introductory stage of the proceedings. Instead, the direction to "insert those allegations . . . on which sufficient

16

evidence has been introduced" indicates that the court should give instruction CJI-Civ. 41:4 after the close of evidence.

¶ 40   Regardless, the instruction here did not follow the format of CJI-Civ. 41:4, which is similar in relevant part to CJI-Civ. 41:1.

¶ 41   Many of the allegations in the petition were not ultimately supported by evidence presented at trial. For example, the Department presented no evidence of numerous facts that allegedly prompted the caseworker's concerns — that father admitted using marijuana, that both parents "cussed" and pointed fingers aggressively at the caseworker, that the caseworker feared the family would flee with the child, or that the parents began packing their belongings after she called the police. And no evidence, other than paternal grandfather's speculation, supported the allegation that father was under the influence of methamphetamine while caring for the child or that mother knew of this conduct and disregarded the associated risks. *See People v. Rios*, 2014 COA 90, ¶ 23 (there was no reason for the court to instruct the jury on information that was never introduced into evidence); *see also Barnhisel v. People*, 141 Colo. 243, 246, 347 P.2d 915, 917 (1959)

("[A]n instruction . . . is erroneous if it implies or assumes the existence of evidence not in the record.").

¶ 42    Further, the directions for CJI-Civ. 41:4 limit the content of the instruction to "those allegations . . . which if established would constitute a legal basis for determining that the child is dependent and neglected."  Several of the allegations in the petition do not establish any of the legal bases for adjudication under section 19-3-102.  These allegations include, for example, the following:

- Mother refused to submit to drug testing for herself and the child on a voluntary basis.  (This evidence was also inadmissible.  *See infra* Part IV.)

- The Department obtained a "judge's hold" prior to adjudication.

- The Department was granted custody of the child prior to adjudication.

- The maternal grandmother did not feel comfortable having the parents in her home while she was at work, and she could not guarantee the child would be safe.

- The parents agreed to reside with the maternal grandfather temporarily to ensure a sober caregiver.

- The results of mother's court-ordered drug tests included certain creatinine levels that indicated dilute urine samples, which the Department "determined to be positive."

¶ 43    Thus, the instruction was not a proper CJI-Civ. 41:4 statement of the case.

### D.    The Court's Error Warrants Reversal[3]

¶ 44    We conclude that the juvenile court's instruction was not harmless because it impaired the basic fairness of the trial in a way that likely influenced the outcome of the case.  *See* C.R.C.P. 61; *Canton Oil Corp.*, 731 P.2d at 696.

¶ 45    The instruction was presented in language suggestive of a factual report.  *People v. Williams*, 916 P.2d 624, 627-28 (Colo. App. 1996) (The court has a duty to "insure that its instructions are couched in neutral terms to avoid any implication that it regards certain facts to be established.").  For example, rather than telling the jury that the caseworker *perceived* the parents as volatile and threatening, the court told the jury that "[b]oth parents became very

---

[3] Neither the Department nor the guardian ad litem argues that any error in giving the instruction was harmless.

escalated and uncooperative" with the caseworker, "as evidenced by cussing and pointing fingers aggressively at" her.

¶ 46     The instruction also suggested that certain innocuous and lawful conduct was in fact suspicious. The court told the jury that "[t]he parents were also very volatile, not allowing the [Department] caseworker to view their items left outside of the vehicle." The jury also heard that the caseworker called the police based on her concern that the parents would "flee[] with the child," and that "[w]hile waiting for the police to arrive, [father] began packing up their belongings into their truck/camper."

¶ 47     Because the court's instruction included allegations that were never supported by any evidence, the instruction encouraged the jurors to assume that unadmitted evidence supported the Department's position. *Cf. Domingo-Gomez v. People*, 125 P.3d 1043, 1052 (Colo. 2005) (government counsel should not intimate that he or she has personal knowledge of evidence unknown to the jury).

¶ 48     As well, the instruction included inadmissible allegations, including that mother had declined voluntary drug testing of herself and her child, which was requested by unidentified hospital staff for

unstated reasons, and that mother had refused when the caseworker asked her — without authority — to stop breastfeeding immediately and take a drug test.

¶ 49    In addition, and to make matters worse, a written copy of the instruction was included in the juror notebooks. Thus, the jurors were able to review the improper remarks and unsupported allegations during deliberations. *Cf. Settle v. People*, 180 Colo. 262, 264, 504 P.2d 680, 680-81 (1972) (court must use caution so jury does not give undue weight to evidence it views during deliberations).

¶ 50    We also note that delivering such information in the form of a jury instruction magnified its potential prejudice because the court holds a position of great authority. *Accord United States v. Ofray-Campos*, 534 F.3d 1, 25 (1st Cir. 2008) (The prejudice of extrinsic information was greater because it "was supplied by the trial judge, and thus stamped with the imprimatur of the court, rather than by comparatively less authoritative sources, such as prosecutorial comment."); *see also Rios*, ¶ 35 (trial court's instruction, as opposed to prosecutor's passing reference, improperly emphasized irrelevant evidence).

¶ 51   True, the court followed its lengthy recitation of the Department's allegations with a disclaimer that the allegations were not evidence. But we cannot conclude that the disclaimer neutralized the prejudicial effect of the improper instruction.

¶ 52   We note that at least some prospective jurors did not appear to understand the import of the disclaimer.

¶ 53   Prospective Juror M, for example, told the judge that she considered the allegations to be evidence that the parents had committed the acts described in the instruction. When pressed by the judge, who twice tried to explain that the instruction contained allegations, not evidence, Juror M replied, "Well, you're talking about drug tests, so are those all hypothetical things that you were saying?"

¶ 54   Prospective Juror W believed the court's instruction incorporated a police report. When father's lawyer asked the juror how he had already determined that the child was in an injurious environment, Juror W responded, "Sure. I mean, covering everything we spoke about before, just the police report of how all the action went down, I think that in and of itself has created a pretty harmful environment, especially for a young kid."

22

¶ 55    And Juror W acknowledged that, based on "the volume of allegations," there was "sort of already a strike against" father.

¶ 56    To be clear, our determination that the court's error was not harmless does not hinge on the jurors' comments.[4]  Nevertheless, the prospective jurors' statements provide additional evidence that the juvenile court's instruction confused the jury and prejudiced the parents.

¶ 57    In sum, we conclude that the juvenile court erred when it read detailed allegations from the petition, some of which were unsupported by evidence at trial or relied on inadmissible and unduly prejudicial evidence.  We further conclude that the court abused its discretion because its instructional ruling was manifestly unfair and a misapplication of C.R.C.P. 47, as implemented by CJI-Civ. 41:1 and 41:4.  And we determine that the error was not harmless because it impaired the basic fairness of the trial itself.  Thus, we reverse the judgment and remand the case for a new adjudicatory trial.

---

[4] After the juvenile court denied challenges for cause to these three jurors, the parents' counsel exercised peremptory strikes.

¶ 58    We recognize that mother does not join father in raising this

issue on appeal.  But adjudications of dependency and neglect

relate only to children and are not made "as to" the status of

parents.  *J.G.*, ¶ 38; *cf. People in Interest of T.R.W.*, 759 P.2d 768,

771 (Colo. App. 1988) (no-fault admission of noncustodial parent

does not support adjudication of dependency and neglect when fact

finder determines otherwise).  The error in this case affected the

basic fairness of the adjudicatory trial, and the improper remarks

related as much to mother as to father.  So, our analysis and

disposition apply equally to both parents.

IV.    Mother's Refusal to Voluntarily Submit to Drug Testing

¶ 59    Mother contends that the juvenile court erred when it

admitted evidence that she refused to agree to drug testing for

herself and the child before the Department filed the petition in

dependency and neglect.  Because we have already concluded that

the parents are entitled to a new trial, we need not decide whether

this error provides an independent ground for reversal.

Nevertheless, we elect to address the issue because it may arise on

remand.  *See Westfield Dev. Co. v. Rifle Inv. Assocs.*, 786 P.2d 1112,

1118 (Colo. 1990).  We agree with mother.

## A.      Standard of Review

¶ 60      The Department concedes preservation.  We review the juvenile court's evidentiary rulings for an abuse of discretion. *People in Interest of E.R.,* 2018 COA 58, ¶ 6.  A trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law.  *Id.*

## B.      Drug Testing of Mother and the Child at the Hospital

¶ 61      Mother contends that the juvenile court erred when it admitted evidence that she refused to voluntarily submit to drug testing of herself and the child at the hospital.

### 1.      Circumstances Surrounding Mother's Refusal to Voluntary Submit to Drug Testing

¶ 62      The record does not reveal why hospital personnel requested the tests.  Testimony at trial established that the child exhibited none of the symptoms of prenatal drug exposure described by the various expert witnesses.  Rather, he was born full term at an average birth weight of six pounds, fourteen ounces.  He showed no signs of withdrawal at birth: there was no evidence that he had reflux, extreme tremors, or extreme startle reflexes, and he did not

cry inconsolably. Further, the Department did not offer any evidence that the test was medically necessary to treat the child.

¶ 63 Nor did the Department offer any evidence that mother was under the influence of controlled substances when she gave birth. The record suggests that mother had reported regular use of marijuana at a prenatal visit when she was sixteen weeks pregnant. But no evidence links this report to the request for the drug tests or to the Department's initiation of its investigation.

¶ 64 At the adjudicatory trial, a pediatric nurse who treated the child after he was removed from mother's custody repeatedly referenced mother's refusal to allow the hospital to drug test the child. The caseworker testified that mother's refusal to consent to drug testing of the child was "very concerning" because "why would you refuse something that's going to be negative?" She interpreted mother's refusal to mean "there was something going on. There was usage going on."

¶ 65 Mother contends that evidence of her refusal to consent to the drug testing is irrelevant and therefore inadmissible, as she had no obligation to submit to testing or otherwise cooperate with the hospital or the Department.

26

## 2. Evidence of Mother's Refusal Was Not Relevant

¶ 66    Only relevant evidence is admissible at trial. CRE 402. Evidence is relevant if it has any tendency to make the existence of any fact that is of consequence more probable or less probable than it would be without the evidence. CRE 401.

¶ 67    The Department and the guardian ad litem argue that mother's refusal to consent to drug testing was relevant because it allowed the jurors to conclude that the results would have been positive for controlled substances and that mother wished to prevent the Department from assessing the child's safety. And, once the jury determined that mother had exposed the child to drugs, it could find that the child was dependent and neglected. This argument falters at the first step because the mere fact of mother's refusal does not reasonably lead to the conclusion that the test results would have been positive.

¶ 68    A person's refusal to perform a particular act has probative value only if the person has a duty to perform the act or it would have otherwise "been natural under the circumstances" for the person to take the action. *United States v. Hale*, 422 U.S. 171, 176 (1975). For example, in most circumstances, a person's "silence is

so ambiguous that it is of little probative force." *Id.* But where the "normal reaction" is to speak out in response to a statement, "silence may have some probative value." *People v. Quintana,* 665 P.2d 605, 610 (Colo. 1983); *see also Asplin v. Mueller,* 687 P.2d 1329, 1332 (Colo. App. 1984) (party's refusal to testify in civil case in response to probative evidence against him, and with knowledge of the consequences of his decision, gives rise to a reasonable inference that his testimony would be harmful to his position in the litigation). Similarly, the failure to assert a fact under circumstances in which it would have been natural to assert it has been construed to be the equivalent of a statement of the nonexistence of the fact. *Quintana,* 665 P.2d at 610.

¶ 69   In other words, when the refusal to perform the act is objectively unreasonable, the jury can reasonably infer that the person has refused to perform the act because performance would be detrimental to his or her interests.[5] Under those circumstances,

---

[5] Based on the foregoing analysis, we reject father's argument that evidence of his missed drug tests was irrelevant and inadmissible. Once the magistrate entered an order requiring the parents to submit to drug testing, father's refusal to comply with the order was relevant. His noncompliance was objectively unreasonable, and the

28

the conclusion inferred is "supported by a 'logical and convincing connection'" to the fact proved. *See People v. Perez*, 2016 CO 12, ¶ 25 (citation omitted).

¶ 70    But when the refusal to perform the act may be attributable to a variety of innocent circumstances that are completely unrelated to the inferred conclusion the proponent seeks to educe, the fact of refusal is too ambiguous to be relevant and is therefore inadmissible. *See Quintana*, 665 P.2d at 611.

¶ 71    Here, there was no evidence presented regarding the circumstances of the hospital's request to test. For all the jury knew, hospital personnel had requested that mother submit to drug testing because the hospital routinely tests certain patients or because a new intern wanted to practice performing a drug test on a newborn baby. And without knowing those reasons, the jury could not decide whether they were sufficient to overcome mother's "deep-rooted expectations of privacy" in her bodily fluids. *People v. Barry*, 2015 COA 4, ¶ 22 (citation omitted).

---

jury could have reasonably inferred that he refused to comply because the results would have been detrimental to his interests.

¶ 72    To be sure, we can conceive of some situations in which the "normal reaction" of a parent would be to consent to drug testing of a newborn baby.  If the newborn baby was in medical distress and, in an effort to rule out drug exposure as a possible cause of the baby's condition, a doctor requested the parent's consent to perform a drug test, the parent's refusal would have some probative force, as reasonably suggesting that the parent's strong interest in avoiding a drug test trumped the safety of the child.

¶ 73    In this case, though, the jury had no way to evaluate the objective reasonableness of mother's refusal to consent.  Therefore, any conclusion that mother had refused to consent for a nefarious, rather than an innocent, reason would have been based on complete speculation.  *See People in Interest of R.D.S.*, 183 Colo. 89, 95, 514 P.2d 772, 775 (1973) (inferences may not be based on mere speculation or conjecture).

¶ 74    Importantly, mother was entitled to a presumption that her refusal to consent was objectively reasonable.  Before adjudication, parents enjoy the constitutional presumption that fit parents make decisions that are in their children's best interests.  *People in Interest of N.G.*, 2012 COA 131, ¶ 2.

> That some parents "may at times be acting
> against the interests of their children"
> . . . creates a basis for caution, but is hardly a
> reason to discard wholesale those pages of
> human experience that teach that parents
> generally do act in the child's best interests.
> The statist notion that governmental power
> should supersede parental authority in *all*
> cases because *some* parents abuse and neglect
> children is repugnant to American tradition.

*Parham v. J.R.*, 442 U.S. 584, 602-03 (1979) (some citations omitted) (quoting *Bartley v. Kremens*, 402 F. Supp. 1039, 1047-48 (E.D. Pa. 1975)); *accord* Ch. 240, sec. 1, § 25-4-910, 2014 Colo. Sess. Laws 886-87 (Although a "parent's decision to refuse vaccination for their child carries risk for their child and the community at large," including approximately a twenty-five-fold risk of contracting pertussis, parents may refuse vaccination for their children based on personal belief.).

¶ 75    For these reasons, we conclude that mother's refusal to consent to voluntary drug testing is so lacking in probative value as to be inadmissible.  Thus, the juvenile court abused its discretion when it admitted this evidence.

31

B.    Mother's Refusal to Stop Breastfeeding Pending a Drug Test

¶ 76    Mother contends that the juvenile court abused its discretion when it admitted evidence that she refused the caseworker's request to stop breastfeeding pending a drug test.  We agree.

¶ 77    During her initial contact with the family, the caseworker asked mother to stop breastfeeding the child immediately and take a drug test to show that she was not using controlled substances.  Mother refused.  She told the caseworker that breastfeeding provided nutrition that the child needed.

¶ 78    The Department cannot require a parent to submit to drug testing without a court order.  *See People in Interest of G.E.S.*, 2016 COA 183, ¶ 14 (before adjudication, parents may work with department voluntarily or court may issue orders for protection of the child); *see also* § 19-1-104(3)(a), C.R.S. 2018 (court may enter temporary orders for child's protection upon hearing after prior notice to parent); *accord People v. Diaz*, 53 P.3d 1171, 1177 (Colo. 2002) (the Fourth Amendment and article II, section 7 of the Colorado Constitution prohibit obtaining samples of bodily fluids through a warrantless search and seizure unless an exception to the warrant requirement applies).

¶ 79    Parents may agree to work with the Department on a voluntary basis to address child welfare concerns. *G.E.S.*, ¶ 14. But even after the filing of a petition in dependency and neglect, parents need not assist the Department to prove that their child is dependent and neglected. *Id.*

¶ 80    When mother refused the caseworker's request to stop breastfeeding pending a drug test, the Department had not yet filed a petition in dependency and neglect, and the court had entered no orders. Mother retained her rights as a presumptively fit parent to make decisions in the best interests of her child — including the decision to breastfeed. *See N.G.*, ¶ 2. Accordingly, mother was also within her rights to refuse to stop breastfeeding until she had completed a drug test.

¶ 81    Evidence that mother exercised her right to refuse drug testing on the morning of the child's removal had no probative value in light of the evidence that the child and mother were drug tested later that afternoon and the next morning, respectively, and the results of those tests were negative for all controlled substances. *See People v. Rath*, 44 P.3d 1033, 1041 (Colo. 2002) (in balancing probative value against prejudicial effect, court assesses probative

value of evidence in context of other evidence in the case).  In other words, if evidence of mother's refusal to stop breastfeeding pending a drug test was supposed to give rise to an inference that mother was then using drugs, other evidence negated that inference.

¶ 82     We therefore conclude that the juvenile court abused its discretion when it admitted evidence that mother refused the caseworker's request that she stop breastfeeding pending a drug test.

## V.     Remaining Issues

¶ 83     "An adjudication of dependency or neglect must be based on existing circumstances and relate to the status of the child at the time of adjudication." *People in Interest of A.E.L.*, 181 P.3d 1186, 1192 (Colo. App. 2008).  We cannot determine whether the parents' remaining issues will arise at a new adjudicatory trial on remand because the child's and the parents' circumstances will have evolved.  As a result, we decline to address these contentions.

## VI.     Conclusion

¶ 84     The judgment is reversed, and the case is remanded for a new trial.

JUDGE WEBB and JUDGE WELLING concur.