25CA2186 Peo in Interest of SP 06-18-2026

COLORADO COURT OF APPEALS

Court of Appeals No. 25CA2186
Weld County District Court No. 24JV21
Honorable Troy Hause, Judge

The People of the State of Colorado,

Petitioner,

In the Interest of S.P., a Child,

and Concerning M.P. and Z.K.,

Appellants.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE LUM
Welling and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced June 18, 2026

No Appearance for Petitioner

Josie Burt, Guardian Ad Litem

Just Law Group, LLC, John F. Poor, Denver, Colorado, for Appellant M.P.

Patrick R. Henson, Office of Respondent Parents' Counsel, Justin Twardowski, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant Z.K.

¶ 1     In this dependency and neglect action, M.P. (mother) and Z.K. (father) appeal the judgment allocating parental responsibilities for S.P. (the child) to father's sister and her husband (aunt and uncle). We affirm.

## I.     Background

¶ 2     The Weld County Department of Human Services filed a petition in dependency or neglect after receiving reports that mother tested positive for methamphetamine at the time of birth and that the newborn child was exhibiting symptoms of drug withdrawal. The court granted temporary legal custody of the child to the Department, who placed her with aunt and uncle.

¶ 3     With respect to mother, the juvenile court adjudicated the child dependent or neglected.  The court later adopted a treatment plan for mother by agreement of the parties.  Father admitted the petition, and the court adopted a treatment plan for him, as well.

¶ 4     The parents' treatment plans required them, as relevant here, to (1) address substance abuse by completing evaluations, developing treatment goals, and submitting to substance abuse monitoring; (2) participate in parenting time and demonstrate appropriate parenting skills; and (3) address any mental health

1

issues by completing evaluations and following any recommendations.

¶ 5    The guardian ad litem (GAL) later moved to allocate parental responsibilities to aunt and uncle, who had served as the child's placement provider since birth.  The Department supported the GAL's motion.

¶ 6    Over twenty months after the petition was filed, and after a contested hearing, the juvenile court entered an allocation of parental responsibilities (APR) and closed the dependency and neglect action.

¶ 7    Both parents appeal.  Mother contends that the court erred by (1) awarding custody to aunt and uncle in the absence of evidence that mother was an unfit parent or that the child's health and safety would be at risk in her care; and (2) qualifying the ongoing caseworkers as expert witnesses.  Father contends the court erred by (1) finding that he was unfit; (2) awarding custody to aunt and uncle because father had substantially complied with his treatment plan and father's proposal to return the child to him and mother was in the child's best interest; and (3) denying his motion to

2

continue the APR hearing.  We consider and reject each of these contentions in turn.

## II.    Continuance

¶ 8    First, we disagree with father's contention that the juvenile court erred by denying his motion to continue the APR hearing.

### A.    Applicable Law and Standard of Review

¶ 9    The Colorado Children's Code directs courts to "proceed with all possible speed to a legal determination that will serve the best interests of the child." § 19-1-102(1)(c), C.R.S. 2025.  Thus, when ruling on a motion to continue, the juvenile court "should balance the need for orderly and expeditious administration of justice against the facts underlying the motion and the child's need for permanency."  *People in Interest of R.J.B.*, 2021 COA 4, ¶ 11. When, as here, a case is subject to expedited permanency planning (EPP) standards, the court must not delay or continue any hearing "unless good cause is shown and unless the court finds that the best interests of the child will be served by granting a delay or continuance."  § 19-3-104, C.R.S. 2025.

¶ 10    We review a juvenile court's denial of a motion to continue for an abuse of discretion.  *R.J.B.*, ¶ 13.  A court abuses its discretion

3

"when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies or misconstrues the law." *People in Interest of E.B.*, 2022 CO 55, ¶ 14.

## B. Additional Background

¶ 11 Two months before the APR hearing, new counsel substituted into the case to represent father. At the pretrial readiness conference, held two weeks before the APR hearing, counsel declared "ready to proceed" with the hearing, but noted that "the Department still has their twenty-one-day window to provide us with our initial discovery request." The Department responded that it did not have a discovery request from father.

¶ 12 Two days later, father filed a motion to continue the APR hearing, arguing that "[c]ounsel's communication to the court that he was prepared to move forward with the hearing was based on this belief that he would have access to discovery prior to the APR hearing." Father's counsel noted that he was "mistaken" in his belief that discovery had been requested and said that he requested discovery as soon as he realized this mistake. The Department objected to father's continuance request. The Department noted that father's counsel had fifty-three days to request discovery

following the substitution of counsel and prior to the pretrial readiness conference and argued that a continuance was not in the child's best interest. The juvenile court denied father's request, finding "that discovery was not timely requested and a continuance [was] not in the child's best interests."

¶ 13 Father renewed his request at the beginning of the APR hearing, arguing that counsel received the requested discovery less than twenty-four hours before the hearing and did not have adequate time to review it. The Department and GAL objected to father's request, and the GAL noted that this EPP case had been open almost seventeen months. The court again denied the request, finding that it was not in the child's best interests to continue the matter and that the discovery request was not made timely.

## C. Analysis

¶ 14 Father argues that he was prejudiced by not having discovery until the day before the hearing because it did not allow counsel to "comprehensively plan and prepare for the case." But father does not explain what specific discovery he required from the Department to "comprehensively plan and prepare" to rebut the

5

GAL's APR motion. And he does not identify how additional time to review discovery would have changed the juvenile court's assessment of whether the requested APR was in the child's best interest.

¶ 15 Additionally, the case had been open for over twenty months by the time the juvenile court issued its judgment, the EPP provisions applied, and mother's counsel did not provide any reason for finding that a delay would serve the child's best interests. *See* § 19-3-104.

¶ 16 Thus, father has failed to establish that the juvenile court abused its discretion by finding that a continuance was not in the child's best interest and denying his request.

### III. Expert Testimony

¶ 17 Mother argues that the juvenile court erred by qualifying the Department's caseworkers as expert witnesses because the GAL and Department failed to establish that their testimony was based upon reasonably reliable principles and methods. We disagree.

### A. Preservation

¶ 18 The GAL argues that mother did not preserve this issue, because one party is "not allow[ed] . . . to take advantage of the

objection of another party to preserve an issue for appeal." Mother did not object to the caseworkers' expert testimony. But father objected, and the court ruled on the issue as to each caseworker. Only mother claims on appeal that the court erred in admitting this testimony.

¶ 19    To preserve an issue for appellate review, a party must alert the juvenile court to the issue so that the court has an adequate opportunity to make findings of fact and conclusions of law. *Forgette v. People*, 2023 CO 4, ¶ 21. However, we have not addressed whether one party's objection can preserve an issue for the other party. *See People v. Turner*, 2022 CO 50, ¶ 15 n.2 (noting that we have not addressed "whether a defendant's objection alone can preserve an issue for appellate review for a co-defendant," and other jurisdictions are divided). We need not decide this issue because, even if we assume father's objection preserved mother's claim, we discern no reversible error.

B.    Applicable Law and Standard of Review

¶ 20    *People v. Shreck*, 22 P.3d 68 (Colo. 2001), and CRE 702 govern the admissibility of experience-based expert testimony, including expert testimony offered by department of human services

caseworkers.  *People in Interest of A.F.*, 2025 COA 76, ¶ 16.  To be admissible, the testimony must be reliable and relevant, and its probative value must not be "substantially outweighed by any of the countervailing considerations contained in CRE 403."  *Kutzly v. People*, 2019 CO 55, ¶ 10.

¶ 21    Upon objection, the juvenile court must "make specific findings as to the four *Shreck* factors — reliability, qualifications, usefulness, and CRE 403 — before admitting such testimony."  *A.F.*, ¶ 20.  "The proponent of the expert testimony bears the burden of showing that the testimony satisfies each of those requirements."  *Id.*  The court need not hold an evidentiary hearing, but its findings must be explicit and supported by the record.  *Id.*

¶ 22    We review a juvenile court's admission of expert testimony for an abuse of discretion.  *People in Interest of M.W.*, 140 P.3d 231, 233 (Colo. App. 2006).  A court abuses it discretion by admitting expert testimony without specific findings "unless the record not only supports admission of the contested testimony, but virtually requires it, or if Colorado has already properly accepted the basis of the expert's testimony."  *Kutzly*, ¶ 11.

## C. Analysis

¶ 23      The GAL offered both caseworkers as experts in "child protection casework." Regarding the first caseworker, father objected, arguing that the caseworker's qualifications were "limited to her ability to assess the successes and failures of a parent based on the different aspects of a treatment plan." Father also argued that "the methodology lacks reliability" and that the caseworkers' expert testimony unfairly prejudiced father. Regarding the second caseworker, father objected generally, asking that the caseworker not be accepted as an expert pursuant to *Shreck* and *A.F.* Father asked the court to make specific findings as to the four *Shreck* factors for both caseworkers.

¶ 24      Regarding the first caseworker, the county attorney addressed the four *Shreck* factors, arguing that (1) the caseworker's qualifications had been demonstrated; (2) the "the methods and principles that she relie[d] on in forming her opinions [were] reliable;" (3) her opinions were helpful to the court as the fact finder; and (4) the testimony was not prejudicial under CRE 403. The juvenile court then recognized the caseworker as an expert in child protection casework without making any findings.

¶ 25    We agree with mother that the court erred when it accepted the first caseworker as an expert without making specific findings as required by *A.F.*  However, we ultimately conclude that this error was harmless because the court made findings when it accepted the second caseworker's substantially similar expert testimony.  *See People in Interest of C.C.*, 2022 COA 81, ¶ 20 (an error is harmless unless "it can be said with fair assurance that the error substantially influenced the outcome of the case or impaired the basic fairness of the trial itself") (citation omitted).

¶ 26    Regarding the second caseworker, the county attorney argued that the caseworker's "qualifications have been established, the methods and principles upon which her opinion is based have been shown to be reliable by her testimony [and] most of [her] training is based on methods and principles that are validated by scientific studies."  The county attorney also argued that the testimony would be helpful to the court as the fact finder and that it would not be prejudicial.  The juvenile court "agree[d] with the request from the Department with regards to those findings" and stated that it "will make those findings" pursuant to *Shreck* and CRE 702 "based upon

[the caseworker's] education, knowledge, training, and experience in the field of child protection casework."

¶ 27     The court's findings are not arbitrary or unreasonable because the record supports them.  The second caseworker testified about the various bases for her expert testimony.  The caseworker attended the caseworker academy, which covered topics such as child development, bonding and attachment, and the impact of parental substance abuse and mental health on children.  The caseworker testified that the training methods used in the academy are based on "methods and principles that are validated by scientific studies."  The caseworker explained that her training was designed in collaboration with the Kempe Center for the Prevention of Child Abuse and Neglect, which uses "methods and principles that are validated by scientific studies."

¶ 28     Additionally, the caseworker received risk assessment training based on "a validated tool that [is] used to determine risk assessment scores for families."  She also received training in "adverse childhood experience testing," which is "based on a long-term study involving adverse childhood experiences . . . and how that will impact those children when they become adults."

11

¶ 29　　Finally, the caseworker testified that Volume 7 guides a lot of her casework and that it "was designed using methods and principles that are validated by scientific studies."[1]

¶ 30　　While it is best practice to make express findings, we conclude that by incorporating the Department's record supported argument into its findings, the juvenile court did not misapply *A.F.* and appropriately addressed father's objection by determining that the witness' opinions were based upon reasonably reliable principles and methods.　And the court informed the parties' attorneys that if they believed the caseworkers provided an opinion outside of their expertise, it would address such a contention by contemporaneous objection.　*See A.F.*, ¶ 23 ("If a witness is sufficiently qualified to offer the proposed opinion, and the juvenile court so finds, any challenges to the witness's qualifications go to the weight of the testimony, not its admissibility.").

¶ 31　　But even if the court erred in qualifying the caseworkers as experts, mother has not established that she was prejudiced, and

---

[1] Practitioners often refer to the Colorado Department of Human Services' administrative rules and regulations as "Volume 7."　The rules and regulations are codified in the Colorado Code of Regulations.　See 12 Code Colo. Regs. 2509-1 to -9.

therefore any error was harmless. *See* C.R.C.P. 61 (an evidentiary error is harmless if it does not affect the parties' substantial rights). Mother has not identified any statements made by the caseworkers that would have been inadmissible had the caseworkers testified as lay witnesses. *See A.F.,* ¶ 21 (the court's inquiry into the reliability of the principles underlying the caseworker's testimony must focus on "the specific opinions offered rather than of casework in the abstract"). And the court relied on facts, not expert opinions, to conclude that an APR was in the child's best interests.

## IV. Determination of the APR

### A. Applicable Law and Standard of Review

¶ 32 The Children's Code authorizes a juvenile court to enter an order allocating parental responsibilities and addressing parenting time when it maintains jurisdiction in a case involving a child who is dependent and neglected. § 19-1-104(5)-(6), C.R.S. 2025; *People in Interest of E.Q.,* 2020 COA 118, ¶ 10. When allocating parental responsibilities in a dependency and neglect proceeding, the court must consider the legislative purposes of the Children's Code under section 19-1-102. *People in Interest of J.G.,* 2021 COA 47, ¶ 18. "The overriding purpose of the Children's Code is to protect a child's

13

welfare and safety by providing procedures through which the child's best interests can be served." *Id.* at ¶ 19. Consequently, the court must allocate parental responsibilities in accordance with the child's best interests. *Id.*

¶ 33 Although a juvenile court must sometimes find that a parent is unfit before it may terminate parental rights, *see* § 19-3-604(1)(c)(II), C.R.S. 2025, no such finding is required before a court may allocate parental responsibilities. While parental unfitness "clearly constitutes a compelling reason not to return a child home," parental deficiencies less serious than unfitness can provide a compelling reason to deny the child's return when considered in light of the child's physical, mental, and emotional conditions and needs. *People in Interest of C.M.*, 116 P.3d 1278, 1283 (Colo. App. 2005). Thus, whether a parent is fit or unfit is not dispositive of whether an APR is in the child's best interests. *See People in Interest of L.B.*, 254 P.3d 1203, 1208 (Colo. App. 2011) (APR must be determined in accordance with the child's best interests; a finding of parental unfitness is not required for a child who has been adjudicated dependent or neglected).

¶ 34    Even so, parents maintain a fundamental liberty interest in the care, custody, and control of their children. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000). In *Troxel*, the Supreme Court recognized that a parent who is adequately caring for their child — a fit parent — is presumed to act in their child's best interests. *Id.* at 68-69. Thus, in a dependency and neglect proceeding, if the court determines that a parent has become fit, it must apply the *Troxel* presumption before awarding an APR to a nonparent. *See J.G.*, ¶¶ 21, 27; *People in Interest of N.G.G.*, 2020 COA 6, ¶¶ 18-19. Applying the *Troxel* presumption requires the court to accord "at least some special weight to the parent's own determination" regarding the child's best interests. *J.G.*, ¶ 21 (quoting *Troxel*, 530 U.S. at 70).

¶ 35    Nonetheless, the *Troxel* presumption may be rebutted if clear and convincing evidence shows that the parent's determination is not in the child's best interests and that the nonparent's request is in the child's best interests. *See N.G.G.*, ¶ 16; *In re Parental Responsibilities Concerning B.J.*, 242 P.3d 1128, 1132 (Colo. 2010). The court must also identify special factors that support entering an order contrary to the parent's wishes. *J.G.*, ¶ 22; *see also In*

*Interest of C.T.G.*, 179 P.3d 213, 226 (Colo. App. 2007) (overturning a visitation order based on *Troxel* when the nonparent failed to present evidence of special circumstances to justify an order contrary to the parents' wishes).

¶ 36 Allocating parental responsibilities is a matter within the juvenile court's sound discretion. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15. A court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *People in Interest of M.H-K.*, 2018 COA 178, ¶ 60. Further, we will not disturb a court's factual findings unless they are unsupported by the record. *See J.G.*, ¶ 17. Whether a court applied the correct legal standard in making its findings, however, is a question of law that we review de novo. *Id.*

### B. Father's Fitness and Treatment Plan Compliance

¶ 37 Father contends that the juvenile court erred by finding him unfit because he had addressed his mental health and substance use.

¶ 38 Though not required, the juvenile court found father unfit because he had not shown compliance with "two major components of this treatment plan," substance abuse and mental health

treatment. The court also found that the child would be in danger returning home, because the court had "absolutely no information" regarding the status of father's substance abuse and mental health.

¶ 39 The record supports the court's findings. The first caseworker testified that at the time she stopped working on the case five months before the APR hearing, father had not completed most of his treatment plan. Although father completed an intake for substance abuse treatment with a provider referred by the Department, he never began treatment or sobriety monitoring. Father told the caseworker that he was using a different treatment provider, but he did not provide a release of information, so the caseworker was unable to confirm his participation in treatment or monitoring. The second caseworker testified that at the time of the APR hearing, father still had not signed any releases of information, so she was unable to confirm that father had participated "in anything related to his substance abuse objective."

¶ 40 Regarding father's mental health, the first caseworker testified that, early in the case, family time had to be suspended on four separate occasions because father "became escalated while holding [the child]" and threatened staff. Father did not provide any

17

releases of information to allow the caseworkers to confirm his participation in treatment to address his mental health and related escalations. The second caseworker testified that at the time of the APR hearing she still had concerns regarding father's mental health. The caseworker worried about the child's safety with father because she had "a lack of knowledge of his escalation" and "concerns . . . if it were to come up again."

¶ 41 Additionally, the first caseworker testified that father was not receptive to feedback from nurses and other medical professionals regarding the child's care. And the second caseworker testified that father had not shown that he could care for the child for an extended amount of time without supervision.

¶ 42 Even so, father asserts that based on mother's fitness and his treatment plan compliance, such as addressing his mental health and substance abuse via "alternative methods," the juvenile court erred by not allocating parental responsibilities to him and mother. But this argument essentially asks us to reweigh the evidence, which we cannot do. *People in Interest of K.L.W.*, 2021 COA 56, ¶ 62. It is exclusively within the juvenile court's purview to resolve conflicting evidence. *See B.R.D.*, ¶ 15; *see also People in Interest of*

*A.J.L.*, 243 P.3d 244, 250 (Colo. 2010) ("[I]t is important to defer to the [juvenile] court, particularly when it hears contradictory testimony on material issues . . . ."). And the juvenile court's weighing of the evidence, including father's partial treatment plan compliance and mother's fitness, led it to explicitly conclude that "the child would be in danger in returning home."

¶ 43 Moreover, a parent's treatment plan compliance is not determinative of how the court should allocate parental responsibilities. *See L.B.*, 254 P.3d at 1208. Here, in entering its orders, the juvenile court focused on the child's best interests, giving paramount consideration to her protection and safety. *See People in Interest of H.K.W.*, 2017 COA 70, ¶ 13.

### C. Mother's Fitness

¶ 44 Mother argues that the juvenile court abused its discretion because it awarded custody to aunt and uncle in the absence of evidence that mother was unfit. We are not persuaded.

¶ 45 The juvenile court first found that mother had become fit because she had successfully completed her treatment plan. Based on that finding, the court recognized that the *Troxel* presumption applied and that "there's a higher standard with regards to

overcoming the presumption." But the court concluded that the presumption had been rebutted by clear and convincing evidence showing that the child living with mother was not in her best interests. Specifically, the court found that because mother lived with father, the child "would be in danger in returning home."

¶ 46 The record supports the court's findings. Recall the court's earlier findings that father was unfit and therefore a danger to the child. Mother testified that she was living with father and that she did not have "a lot of support outside of [father]." And the first caseworker testified that mother planned on parenting with father. The caseworker opined that because the Department had to "look at [the parents] as a unit," mother was not "able to demonstrate the protective factors that were needed for [the child]." The second caseworker testified that "[t]he only safety concerns regarding [mother] would just be . . . the protectiveness of her if [father] was to get escalated again."

¶ 47 The second caseworker also testified that mother did not have the ability "to care for [the child] for an extended amount of time unsupervised." Ultimately, the second caseworker opined that a

return to the parents was not in the child's best interest and that the GAL's proposed APR to aunt and uncle was.

¶ 48 Accordingly, we reject mother's argument that the juvenile court should have granted her an APR simply because she was a fit parent. *See C.M.*, 116 P.3d at 1283 ("[P]arental deficiencies less serious than unfitness may give rise to a compelling reason not to return the child home when considered in light of the child's physical, mental, and emotional conditions and needs.").

## D. Endangerment

¶ 49 Next, citing section 14-10-129(1)(b)(I), C.R.S. 2025, mother asserts that "in the domestic relations context, a court may not restrict a parent's time with his or her children unless parenting time would endanger the child's physical health or significantly impair the child's emotional development." From that premise, mother argues that the court erred in restricting her parental role without a health and safety concern that justified such a restriction, violating her constitutional right to parent.

¶ 50 But section 14-10-129(1)(b)(I) is part of the Uniform Dissolution of Marriage Act (UMDA). When a custody issue arises in a dependency and neglect proceeding, the court is guided by the

21

Colorado Children's Code, not the UMDA. *See J.G.*, ¶ 18; *L.B.*, 254 P.3d at 1208. Consequently, unlike a restriction of parenting time in the domestic relations context, a court need not find endangerment before allocating parental responsibilities in a dependency and neglect case. *See L.B.*, 254 P.3d at 1208.

¶ 51 Accordingly, whether the child would be endangered if she lived with mother was not dispositive of the juvenile court's APR determination. Even so, as examined above, the juvenile court concluded that the child would be in danger if placed with mother.

### E. Delegation

¶ 52 Finally, mother contends that the juvenile court erred when it granted aunt and uncle discretion to require her to submit to substance abuse testing; a provision that, in her view, amounted to an improper delegation of parenting time.

¶ 53 To be sure, whether to suspend family time or require a parent to complete certain tasks before family time can begin are not decisions that a juvenile court may delegate to third parties. *People in Interest of D.G.*, 140 P.3d 299, 302 (Colo. App. 2006); *see also People in Interest of B.C.*, 122 P.3d 1067, 1071 (Colo. App. 2005) (stating that recommendations as to family time are subject to the

continuing supervision and review of the juvenile court, which retains ultimate decision-making responsibility). But no such delegation occurred here.

¶ 54    The APR order allows aunt and uncle to "at any time ask [mother] to submit to substance abuse testing to prove ongoing sobriety," and, upon a positive or dilute test, to "file a motion to restrict parenting time pursuant to [section] 14-10-129(4)." This provision provides a mechanism for the juvenile court to review family time in light of new substance abuse concerns. But the court retains the ultimate decision-making responsibility.

¶ 55    Thus, we do not read this provision as improperly delegating the juvenile court's responsibility to make decisions about parenting time. *See B.C.*, 122 P.3d at 1070-71.

¶ 56    To the extent mother argues generally that the record did not support a conclusion that the substance abuse provision was in the child's best interests, we disagree. Recall that the case opened because mother tested positive for methamphetamine at the time of birth and the newborn child exhibited symptoms of drug withdrawal. To be sure, mother successfully completed the substance abuse component of her treatment plan. But upon

completion of her substance abuse treatment, she did not follow recommendations to stay at a sober living house and instead decided to live with father. And, as examined above, father did not complete the substance abuse component of his treatment plan, and the court found that the child would be in danger returning home because, in part, the court had no information about father's substance use.

## F. Conclusion

¶ 57 We conclude that the juvenile court applied the correct legal standard for allocating parental responsibilities to a nonparent in a dependency and neglect case and that the record supports its determination that an APR to the parents was not in the child's best interests. Accordingly, we discern no error. *See E.B.*, ¶ 14; *B.R.D.*, ¶ 15.

## V. Disposition

¶ 58 The judgment is affirmed.

JUDGE WELLING and JUDGE SCHOCK concur.