24CA1471 Peo in Interest of FM 03-20-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 24CA1471
Weld County District Court No. 21JV262
Honorable Anita Crowther, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of F.M., a Child,

and Concerning J.O.,

Appellant.

---

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE FREYRE
Schock and Sullivan, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 20, 2025

---

Bruce T. Barker, County Attorney, David S. Anderson, Assistant County Attorney, Greeley, Colorado, for Appellee

Jenna L. Mazzucca, Counsel for Youth, Salida, Colorado, for F.M.

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant

¶ 1    In this dependency and neglect proceeding, J.O. (mother) appeals the juvenile court's judgment allocating parental responsibilities for F.M. (the child) to the child's paternal grandmother. We reverse the judgment and remand the case for further proceedings.

## I.    Background

¶ 2    In April 2021, the Weld County Department of Human Services received a referral indicating that the then-ten-year-old child reported that her father sexually abused her and drank too much; that she had homicidal ideations toward him; and that she would kill herself if she had to go back to him. The Department noted that the parents were involved in a "very contentious divorce case" and that mother was living in Utah. After conducting an investigation, the Department filed a petition in dependency and neglect alleging concerns about the parents' domestic violence and substance use, as well as the child's mental health.

¶ 3    The juvenile court granted temporary custody to the Department, and the child was placed with her paternal grandmother. Based on the parents' admissions, the court adjudicated the child dependent or neglected. The court then

adopted treatment plans for both parents. Shortly thereafter, the caseworker reported that mother began to comply with her treatment plan by completing a psychological evaluation; engaging in individual and family therapy; regularly communicating with the Department; and attending in-person family time with the child.

¶ 4 In November 2021, the Department received an approved home study under the Interstate Compact on the Placement of Children (ICPC) for mother's home in Utah, but the caseworker reported that the home study did not include certain documents. Around the same time, the caseworker noted that the child wanted to move to Utah to live with their mother. In January 2022, mother moved the juvenile court to order that the child be returned to her in Utah, but the Department was still waiting for the remainder of the ICPC documents. And by that point, counsel for youth (CFY) reported that the child changed her mind and no longer wished to move to Utah.

¶ 5 In the summer of 2022, the child began refusing to go to family therapy or family time with mother. Consequently, mother moved the juvenile court to find that the Department was not making reasonable efforts and asked it to reinstate family therapy.

Thereafter, the CFY moved for an allocation of parental responsibilities (APR) to paternal grandmother.

¶ 6     Beginning in June 2023, the juvenile court held a four-day APR hearing over the course of four months. In December 2023, the court issued an order finding that: (1) mother had completed all treatment requirements and was a fit parent; (2) father was not a fit parent; (3) the caseworker's testimony was not credible; (4) paternal grandmother's testimony was not credible, (5) the thirteen-year-old child wanted to remain with paternal grandmother but was "not sufficiently mature" to make that decision; (6) the Department had not made reasonable efforts to reunite mother with the child; and (7) the CFY failed to meet his burden. The court further found that it was not in the child's best interest for paternal grandmother to have sole APR at that time, ordered the Department to arrange reunification therapy, and held the APR motion in abeyance.

¶ 7     Six months later, the court heard additional testimony from the family therapist, who the court found credible. The therapist opined that the child was not afraid of mother, that she had no safety concerns preventing reunification, and that she supported a three-phase transition plan that would transition the child to Utah

to live with mother. The therapist said the child could go back to mother immediately and that such returns happen all the time; however, she believed the transition plan was the more thoughtful approach, given the communications difficulties among the family members. The juvenile court reaffirmed its earlier finding that mother was a fit parent and father was not. But it found that the child's relocation to Utah was not in her best interest and that mother's *Troxel* presumption had been overcome by clear and convincing evidence. The juvenile court then issued an order allocating parental responsibilities to paternal grandmother and granting mother weekend parenting time twice per month. It certified the APR judgment into the parties' pre-existing domestic relations case.

## II. Applicable Law and Standard of Review

¶ 8 The Children's Code authorizes a juvenile court to enter an order allocating parental responsibilities and addressing parenting time when it maintains jurisdiction in a case involving a child who is dependent and neglected. § 19-1-104(5)-(6), C.R.S. 2024; *People in Interest of E.Q.*, 2020 COA 118, ¶ 10. When allocating parental responsibilities in a dependency and neglect proceeding, the court

must consider the legislative purposes of the Children's Code under section 19-1-102, C.R.S. 2024. *People in Interest of J.G.*, 2021 COA 47, ¶ 18. The overriding purpose of the Children's Code is to protect a child's welfare and safety by providing procedures through which the child's best interests can be served. *Id.* at ¶ 19. Consequently, the court must allocate parental responsibilities in accordance with the child's best interests. *Id.*

¶ 9 Nonetheless, parents maintain a fundamental liberty interest in the care, custody, and control of their children. *See Troxel v. Granville*, 530 U.S. 57, 66 (2000). In *Troxel*, the Supreme Court recognized that a parent who is adequately caring for his or her child — a fit parent — is presumed to act in the child's best interests. *Id.* at 68-69. Thus, if the court determines that a parent in a dependency and neglect proceeding has become fit, it must apply the *Troxel* presumption before awarding an APR to a nonparent. *J.G.*, ¶¶ 21, 27; *see also People in Interest of N.G.G.*, 2020 COA 6, ¶¶ 18-19.

¶ 10 Applying the *Troxel* presumption requires the court to accord "at least some special weight to the parent's own determination regarding the child's best interests." *J.G.*, ¶ 21 (quoting *Troxel*, 530

U.S. at 70). This includes the parent's determination that he or she should have sole discretion to determine when a nonparent may visit the child. *N.G.G.*, ¶ 15.

¶ 11    The *Troxel* presumption may only be rebutted if the nonparent shows by clear and convincing evidence that the parent's determination is not in the child's best interests and that the nonparent's request is in the child's best interests. *Id.* at ¶ 16; *see also In re Parental Responsibilities Concerning B.J.*, 242 P.3d 1128, 1132 (Colo. 2010). The ultimate burden is on the non-parent. *Id.* The court must also identify special factors that support entering an order contrary to the parent's wishes. *J.G.*, ¶ 22; *see also In Interest of C.T.G.*, 179 P.3d 213, 226 (Colo. App. 2007) (overturning a visitation order based on *Troxel* when the non-parent failed to present evidence of special circumstances to justify an order contrary to the parents' wishes).

¶ 12    Allocating parental responsibilities is a matter within the sound discretion of the juvenile court. *In re Parental Responsibilities Concerning B.R.D.*, 2012 COA 63, ¶ 15. A court abuses its discretion when its ruling is "manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law." *People in Interest of M.H-K.*,

2018 COA 178, ¶ 60.  Further, we will not disturb a court's factual findings unless they are (1) unsupported by the record, *see J.G.*, ¶ 17, or (2) supported by the record, but we are nonetheless left, after a review of the entire evidence, with the firm and definite conviction that a mistake has been made, *see Indian Mountain Corp. v. Indian Mountain Metro. Dist.*, 2016 COA 118M, ¶ 31.  Whether a court applied the correct legal standard in making its findings, however, is a question of law that we review de novo. *J.G.*, ¶ 17.

### III.      Discussion

¶ 13      Mother contends that the juvenile court erred by concluding that her *Troxel* presumption had been overcome.  She also argues that the record did not support the court's finding that an APR to paternal grandmother was in the child's best interests.  Because these issues are intertwined, we address them together and conclude that the court's APR judgment constituted an abuse of discretion.

### a. Additional Background

¶ 14      At the end of June 2023, the juvenile court began its hearing on the CFY's motion for an APR to paternal grandmother.  At that time, the court heard testimony from the caseworker, the child,

paternal grandmother, maternal grandmother, maternal grandfather, and an expert witness endorsed by mother. In September 2023, the hearing concluded after mother and her expert witness testified. Three months later, the court issued an order holding the APR in abeyance for six months. It found, as relevant here, the following:

- By the time the child began refusing to attend family time and family therapy, mother had completed her treatment plan and was "by all accounts . . . a fit and proper parent."

- The Department "failed to implement remedies or make any attempts to reunify [mother and the child] for over a year," which constituted a lack of reasonable efforts.

- The caseworker was not credible "regarding multiple areas of her testimony."

- The child was not sufficiently mature enough to make the initial decision to refuse all contact with mother, and she was not mature enough to make that decision at the time of the hearing; it was "unfair that the adults in this case expected her to."

- Paternal grandmother's testimony that she was "willing to encourage the relationship and communicate with mother regarding [the child] was not credible."

- At that time, it was "not in [the child's] best interest[s] for [paternal grandmother] to have sole [APR], and the CFY has failed to meet his burden."

¶ 15    Over the six months following the juvenile court's order, it held several review hearings but did not take additional evidence related to the APR motion. In May 2024, mother filed a forthwith motion for a court-ordered plan to return the child to her. At that time, she proposed a transition plan that would start with her exercising extended parenting time in Colorado and eventually end with the child moving to Utah and an APR to mother. Around the same time, the caseworker filed a family services plan which indicated that paternal grandmother told the head of the Department's child support division that father was living with her and was providing all of the child's care and transportation, despite father's failure to comply with substance abuse treatment and random urinalysis. But neither father nor paternal grandmother had informed the caseworker of this apparent change in living arrangements.

¶ 16 In June 2024, the court held another hearing at which only the family therapist testified. At the end of that hearing, the court stated that this case was "essentially a domestic relations case" and that it did not need another hearing or any argument to rule on the APR motion. But it ordered the Department to file an updated family services plan and all parties to file updated, "ideal" proposed parenting plans before it entered its final APR judgment. Notably, the Department's updated family services plan reiterated that father may be living in the home with the child. It also stated that father's recent urinalysis result was abnormal and that he reported he had relapsed. And, contrary to father's representations that he had engaged in domestic violence treatment, "it was discovered that [he] only attended one session and was dismissed from treatment for not being honest with the treatment provider." Moreover, the Department reported that the relationship between mother and the child is "positive"; that there were no safety concerns related to mother; and that nothing in the child's medical records indicated that the child was having direct anxiety from her family time with mother.

¶ 17    Over a year after the APR hearing started, the juvenile court entered a final APR judgment granting joint decision-making between mother and paternal grandmother and ordering that the child's primary residence remain with paternal grandmother while mother would have weekend parenting time twice per month.  The court found, as relevant here, the following:

- "Mother is a fit and proper parent," but "father is not fit."

- "At the APR hearing [conducted in June and September 2023], the Department and [CFY] presented substantial evidence to rebut the presumption that mother will act in the child's best interests, including [the child's] own testimony."

- The family therapist [who testified in 2024] was the "only credible professional to provide evidence" who had worked with both mother and the child.

- "Mother's *Troxel* presumption . . . [was] overcome by clear and convincing evidence as demonstrated by the Department and the CFY at the APR hearing, and by the [family therapist's] testimony . . ."

11

- "Mother's request for the child to move immediately to Utah [was not] in the child's best interest[s]," and a move to Utah would be detrimental to the child's emotional and mental health.

¶ 18　The court made no findings concerning the three-phase transition plan mother proposed and with which the family therapist agreed.

b. Analysis

¶ 19　We begin by acknowledging that the juvenile court correctly articulated the applicable legal standards for determining whether an APR to paternal grandmother could be entered over mother's objection. Specifically, the court noted that because mother was a fit parent, she was entitled to a *Troxel* presumption, and that the presumption could only be rebutted by clear and convincing evidence showing that mother's determination was not in the child's best interests and that the CFY's request was.

¶ 20　Nonetheless, we conclude that the court abused its discretion by relying largely on evidence it had previously found to be insufficient and making findings that conflicted with its prior findings without explanation. *See S. Cross Ranches, LLC v. JBC*

*Agric. Mgmt., LLC*, 2019 COA 58, ¶¶ 46-49 (holding that district court abused its discretion by making inconsistent rulings without explanation or consideration of prior ruling). Recall that in December 2023, after hearing four days of evidence on the CFY's motion for an APR to paternal grandmother, the court specifically found that the CFY "failed to meet his burden" and that an APR to paternal grandmother was not in the child's best interest. But six months later, the court credited that same evidence to support an opposite finding — that the CFY met his burden to overcome mother's *Troxel* presumption and to show that an APR to paternal grandmother was in the child's best interest. More specifically, in its final APR judgment, the court relied heavily on "the child's own testimony" despite its earlier finding, based on the same evidence, that the child was not sufficiently mature enough to be making decisions about whether she should have parenting time with mother. The court also found that the Department presented "substantial evidence" despite its earlier finding, based on the same evidence, that the Department's only witness, the caseworker, was not credible. It further found that paternal grandmother "supported [the child's] relationships with both parents" despite its earlier

finding, based on the same evidence, that paternal grandmother's testimony that she was willing to encourage the child's relationship with mother "was not credible."

¶ 21    We acknowledge that the juvenile court also credited the family therapist's testimony, which was the only new evidence it heard after its first order finding that the CFY failed to meet his burden.  But the court did not explain how the therapist's testimony, on its own, showed, by clear and convincing evidence, that mother's request for the child to move to Utah was not in the child's best interests and that the CFY's request for an APR to paternal grandmother was.  True, the therapist testified that a move to Utah could impact the child's relationships with the rest of her family and that the child was not "imagining a life in Utah."   She also testified that the child had been having extreme anxiety, and that the child's individual therapist had said the conversation about moving to Utah had been "triggering."  And the juvenile court cited this testimony in its order.  But even assuming that these were the "special factors" the court relied upon in making its determination under *Troxel*, it did not explain how these factors justified interfering with mother's wishes, particularly given the court's

determination that mother was the child's only fit parent.  *See J.G.*, ¶ 44.

¶ 22    Additionally, we note that the family therapist testified that that she could not say if an immediate move to Utah would have a positive or negative impact on the child; that mother and the child had a "foundation and a mutual reciprocated emotional connection"; that the "best case scenario" would be for mother to "gradually shift into [a] parent-child dynamic" with the child; and that the child was not afraid of mother in any way.  And she stated that "it was about time" for mother to be given the opportunity to parent her child and that she had never been part of a case "where a mom finished her treatment plan and [had] done the work and showed up, [but] hadn't been given at least the opportunity to . . . be a parent to her child."  Although we do not reweigh the evidence on appeal, we cannot decipher, in light of the foregoing, how the juvenile court concluded that the therapist's testimony — combined with testimony it had previously found incredible or insufficient — was sufficient to support its finding that mother's request for the child to move to Utah was not in the child's best interests.  *See Indian Mountain Corp.,* ¶ 31.

¶ 23    Moreover, the record indicates that although the juvenile court was required to base its determination on the circumstances existing at the time of the proceeding, *see N.G.G.,* ¶ 29, by the time it entered its final APR judgment, it had been over a year since it heard the majority of the evidence. And, according to the court, "things [had] changed since the last court order." Indeed, a week before the family therapist testified, the court stated it would need to know "what happened in the past six months" and anticipated "hearing from" the child, the family therapist, the caseworker, and the parents. And by that point, the Department had already filed at least one family services plan in which the caseworker reported that father was apparently living with paternal grandmother and the child despite the Department's concerns about his sobriety and treatment plan compliance. Then, at the hearing, the family therapist testified that "lots of things [had] changed" since the "last court hearing," including having a "new team of people working with [the family], a new caseworker, a new supervisor, [and] a new therap[ist]." After that, the Department filed another family services plan in which the caseworker reiterated the Department's concerns about father's sobriety and lack of domestic violence

treatment but acknowledged mother's significant progress and noted the Department's lack of concerns about mother's relationship with the child. Even so, by the time it entered the APR judgment, the court apparently changed its mind about the necessity of more up-to-date testimony from any of the parties and instead relied on evidence that was presented a year before it entered its final judgment. Although we do not imply that a court may never rely on year-old evidence, we conclude that in this instance, such reliance constituted an abuse of discretion, particularly considering that the court acknowledged that circumstances had changed, and it had already found the year-old evidence to be insufficient to support an APR to paternal grandmother.

## IV.    Disposition

¶ 24    The judgment is reversed, and the case is remanded to the juvenile court. On remand, the court must take additional evidence concerning the current circumstances and (1) apply the *Troxel* presumption in favor of mother's decisions regarding the child; (2) determine whether the presumption has been rebutted by clear and convincing evidence showing that mother's decisions are not in the

17

child's best interests; and (3) place the ultimate burden on the CFY to show that the APR to paternal grandmother is in the child's best interests.  If the court determines the CFY has met the burden to overcome mother's *Troxel* presumption, the court must identify special factors that justify interfering with mother's decisions.

JUDGE SCHOCK and JUDGE SULLIVAN concur.