25CA0515 Peo in Interest of DR 10-30-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 25CA0515
El Paso County District Court No. 24JV30415
Honorable Robin Chittum, Judge

---

The People of the State of Colorado,

Appellee,

In the Interest of D.R., a Child,

and Concerning A.G. and C.R.,

Appellants.

---

JUDGMENT AFFIRMED

Division I
Opinion by JUDGE J. JONES
Kuhn and Moultrie, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 30, 2025

---

Kenneth R. Hodges, County Attorney, Amy C. Fitch, Assistant County Attorney, Colorado Springs, Colorado, for Appellee

Josie L. Burt, Guardian Ad Litem

Andrew A. Gargano, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant A.G.

Patrick R. Henson, Office of Respondent Parents' Counsel, Chelsea A. Carr, Office of Respondent Parents' Counsel, Denver, Colorado, for Appellant C.R.

¶ 1    C.R. (father) and A.G. (mother) appeal the judgment adjudicating D.R. (the child) dependent or neglected. We affirm.

## I.    Background

¶ 2    In April 2024, the El Paso County Department of Human Services received a report that mother had given birth at home and hadn't received any prenatal or postnatal care. The parents had two previous dependency or neglect cases involving children who were born exposed to substances, one of which was still ongoing when the child was born. The Department believed that the parents were living with paternal grandmother when the child was born, and a caseworker from the Department visited grandmother's home but didn't locate the parents or the child.

¶ 3    The Department continued its efforts to locate the parents and child, but the parents were "actively avoiding" contact. In May 2024, the caseworker located father in the county jail, but when the caseworker spoke with him, he claimed that there "was no baby." The Department finally located the parents and child in June 2024, removed the child from the parents' care, and filed a petition in dependency or neglect. The parents denied the allegations and asked for a jury trial.

¶ 4     The juvenile court held a jury trial over four days in October and November 2024.  At the trial, the Department presented evidence from several witnesses who were involved in the parents' previous cases, including mother's and father's treatment providers, an intake caseworker, and an ongoing caseworker.  The intake caseworker also testified about her involvement with the intake in this case.

¶ 5     After hearing the evidence, the jury found that the Department had proved that the child was dependent or neglected under section 19-3-102(1)(b)-(e), C.R.S. 2025.  Based on the jury's verdicts, the court sustained the petition, entered an adjudication, and adopted treatment plans for both parents.

## II.     Admissibility of Facts Related to Previous Cases

¶ 6     The parents contend that the juvenile court erred by admitting evidence of their previous dependency or neglect cases.  We disagree.

### A.     Applicable Law and Standard of Review

¶ 7     Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without

2

the evidence." CRE 401. But even relevant evidence should be excluded under CRE 403 "if its probative value is substantially outweighed by the danger of unfair prejudice."

¶ 8 Evidence of other crimes, wrongs, or acts is not admissible "to prove a person's character in order to show that on a particular occasion the person acted in conformity with the character." CRE 404(b)(1). Generally, when a party presents evidence of other acts under Rule 404(b), the trial court should apply the four-part test set forth in *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990).

¶ 9 In *People in Interest of A.W.*, 2015 COA 144M, ¶¶ 19-23, a division of this court determined that Rule 404(b) and *Spoto* didn't apply to evidence of a parent's past treatment of her older children when offered to establish "prospective harm." Prospective harm analysis requires a fact finder to predict whether the child will be dependent or neglected if returned to the parents. *People in Interest of S.N.*, 2014 COA 116, ¶¶ 16-17. In assessing prospective harm, the fact finder may consider the parent's (1) past treatment of other children; (2) condition, such as mental illness, physical disability, or incarceration; and (3) conduct, such as drug use, physical abuse, or violence. *Id.* at ¶ 18; *see also People v. D.A.K.*, 596 P.2d 747,

749-50 (Colo. 1979) ( "[T]he child's situation on the day of the hearing cannot be viewed in a vacuum" and the evidence must be "considered in the context of the child's history as well as the respondent parent's prior behavior.").

¶ 10    We review the juvenile court's decision to admit evidence for an abuse of discretion. *People in Interest of M.H-K.*, 2018 COA 178, ¶ 60. A court abuses its discretion when its decision is manifestly arbitrary, unreasonable, or unfair, or when it misapplies the law. *People in Interest of A.N-B.*, 2019 COA 46, ¶ 9.

## B.    Analysis

¶ 11    Father's attorney moved to preclude evidence of the two previous dependency or neglect cases, asserting that the evidence was inadmissible under Rule 404(b). Relying on *A.W.*, the juvenile court denied that motion, determining that neither Rule 404(b) nor *Spoto* applied. The court also determined, however, that it still needed to analyze the evidence under Rule 403, and it found that the probative value of the evidence wasn't substantially outweighed by the danger of unfair prejudice, considering that (1) the evidence was "really recent" and had "similar allegations" and (2) any

prejudice could be "mitigated" by giving the jury a limiting instruction.

¶ 12    Father's attorney proposed a limiting instruction, which the juvenile court edited and presented to the jury as follows:

> You have heard evidence related to prior [dependency or neglect] cases involving [the parents] and children other than [the child]. This evidence is being offered for the limited purpose of showing prospective harm. This evidence may only be considered for that limited purpose. You cannot use this evidence to show bad character or propensity.

The court read the instruction to the jury before the testimony of the parents' treatment providers, the ongoing caseworker, and the intake caseworker, and it also provided a written version before deliberations.

¶ 13    At the trial, the Department presented evidence that the parents had substance abuse and mental health problems that had not been addressed during the previous cases. For example, the record shows that the parents completed dual diagnosis evaluations during the first case, and the evaluators diagnosed both parents with substance abuse disorders and mother with bipolar disorder. The evaluators recommended outpatient treatment and sobriety

monitoring, but the parents didn't participate in either. The Department filed the second case after the child at issue in that case tested positive for methamphetamine at birth. The ongoing caseworker in the second case testified that neither parent participated in treatment during that case, and the parents indicated that they weren't participating because they "did not need treatment."

¶ 14 We conclude that the juvenile court didn't abuse its discretion by deciding that Rule 404(b) and *Spoto* didn't apply to evidence related to the parents' previous cases. In this case, the Department presented evidence that the parents had a history of substance use and mental health problems and had not complied with mandated treatment in the recent past. The jury could use this evidence to predict whether it was likely or expected that the parents could provide proper parental care if the child was returned to their care. *See S.N.,* ¶ 17; § 19-3-102(1)(b). This is precisely the type of evidence that is admissible to establish prospective harm, *see S.N.,* ¶ 18, and, according to *A.W.,* when a party offers evidence of prospective harm, Rule 404(b) and *Spoto* don't apply, *see A.W.,* ¶ 23.

¶ 15    The parents assert that the Department couldn't offer evidence of their previous cases for purposes of prospective harm analysis because the child wasn't removed at birth.  In support, the parents note that the published cases focusing on prospective harm, including *A.W.*, involve children who were removed at birth.  *See People in Interest of D.L.R.*, 638 P.2d 39, 40 (Colo. 1981); *A.W.*, ¶ 4; *S.N.*, ¶ 2.  To be sure, in such cases, because a child isn't in the parent's care, the fact finder is generally *required* to use prospective harm analysis.  *See A.W.*, ¶ 22.  But nothing in our case law prohibits the application of prospective harm analysis in circumstances, such as those in this case, when a child isn't removed from a parent at birth.  *Cf. People in Interest of C.M.*, 2024 COA 90, ¶ 29 (recognizing the applicability of prospective harm analysis in a case involving a child who wasn't removed until thirty-six days after birth).  Indeed, we read *A.W.* to hold that Rule 404(b) doesn't apply to evidence of prospective harm because this type of evidence isn't offered to show that the parent acted in conformity with a character trait on a "particular occasion."  Rather, this evidence allows the fact finder to predict the home environment and potential parental care to which a child might be exposed if

returned to the parent.  *See A.W.*, ¶¶ 21-22.  We therefore reject the parents' assertion.

¶ 16     Because we conclude that the juvenile court didn't err by deciding that Rule 404(b) and *Spoto* didn't apply, we don't address the parents' contention that the evidence didn't pass muster under *Spoto.*

¶ 17     Finally, we reject the parents' assertion that the evidence was inadmissible under Rule 403.  The evidence of the parents' substance abuse and mental health problems was highly probative of whether the child would lack proper parental care if returned to the parents.  And, because the court gave the jury a limiting instruction, we must presume that the jury didn't use the evidence for an improper purpose.  *See A.W.*, ¶ 27.  To the extent the parents assert that the limiting instruction was insufficient to cure any prejudice, we reject that argument in Part IV, below.  We therefore conclude that the parents weren't unfairly prejudiced by the court's decision to admit the evidence relating to the previous cases.  *See id.* (presuming that the jury did not use the evidence for an improper purpose because the parent failed to "indicate[] how the

jury did not abide by the limiting instruction" and the evidence was "not so prejudicial that the jury could not follow th[e] instruction").

## III.   Sufficiency of the Evidence

¶ 18    Mother contends that the evidence was insufficient to support the jury's verdicts.  We disagree.

### A.   Applicable Law and Analysis

¶ 19    As now relevant, a child is dependent or neglected if (1) the child "lacks proper parental care through the actions or omissions" of a parent; (2) the child's "environment is injurious to his or her welfare"; (3) the parent "fails or refuses to provide the child with proper or necessary subsistence, education, medical care, or any other care necessary for his or her health, guidance, or well-being"; or (4) the child is "homeless, without proper care, or not domiciled with his or her parent . . . through no fault of [the] parent."  § 19-3-102(1)(b)-(e).

¶ 20    An adjudication of dependency or neglect must be based on existing circumstances and related to the child's status at the time of adjudication.  *People in Interest of A.E.L.*, 181 P.3d 1186, 1192 (Colo. App. 2008).  But that doesn't mean that a fact finder must determine that the child is receiving improper care at the time of

9

the hearing.  *People in Interest of S.X.M.*, 271 P.3d 1124, 1130 (Colo. App. 2011).  Rather, an adjudication may be based on past, current, or prospective harm.  *See People in Interest of G.E.S.*, 2016 COA 183, ¶ 15.

¶ 21     "Whether a child is dependent [or] neglected presents a mixed question of fact and law because it requires application of evidentiary facts to the statutory grounds."  *People in Interest of M.M.*, 2017 COA 144, ¶ 17.  To establish that a child is dependent or neglected, a department must prove the allegations in the petition by a preponderance of the evidence.  *See* § 19-3-505(1), (7)(a), C.R.S. 2025; *People in Interest of S.G.L.*, 214 P.3d 580, 583 (Colo. App. 2009).

¶ 22     When determining whether the evidence is sufficient to sustain an adjudication, we consider the evidence in the light most favorable to the prevailing party and draw every inference fairly deducible from the evidence in favor of the jury's verdicts.  *S.G.L.*, 214 P.3d at 583.  We won't disturb the jury's verdicts if the evidence supports them, even though reasonable people might arrive at different conclusions based on the same facts.  *Id.*; *People in Interest of T.T.*, 128 P.3d 328, 331 (Colo. App. 2005); *see also Thomas v.*

*People*, 2021 CO 84, ¶ 10 (an appellate court may not "invade the jury's province by second-guessing any findings that are supported by the evidence").

### B.  Analysis

¶ 23    Viewing the evidence in the light most favorable to the Department and drawing every fairly deducible inference in favor of the jury's verdicts, we conclude that the record contains sufficient evidence to support the jury's determination that the child was dependent or neglected under section 19-3-102(1)(b), (c), and (d). *See S.G.L.*, 214 P.3d at 583.

¶ 24    First, the Department presented sufficient evidence to establish that, based on mother's substance use and mental health problems, the child would lack proper parental care if she was returned to mother.  § 19-3-102(1)(b).  As already discussed in Part II, above, the Department presented evidence that mother was diagnosed with a substance use disorder and bipolar disorder and that she hadn't completed any treatment.  Mother's treatment provider, who was qualified as an expert in addictions and mental health evaluations, opined that a person is very unlikely to successfully address these problems without treatment.  The

treatment provider also described the ways in which these disorders can impact a person's ability to parent a child, such as impairing judgment and decision-making, delaying reactions, and suppressing or elevating emotions.

¶ 25　　Mother asserts that the child wasn't dependent or neglected because there was no evidence that she used substances during her pregnancy or that substance use affected the child's care while she had custody of the child.  Nothing in section 19-3-102(1)(b) required the Department to establish that mother used substances during her pregnancy.  *Cf.* § 19-3-102(1)(g) (a child is dependent or neglected when, among other things, the child "is born affected by alcohol or substance exposure").  And because the Department presented evidence of mother's history of substance abuse to establish prospective harm, it didn't need to show that she was using substances during her pregnancy or for the two months that she was caring for the child.  Although the jury could consider the lack of evidence as to these two points, we disagree with mother that, as a matter of law, the jury couldn't find the child dependent or neglected based on evidence of mother's past substance use under a prospective harm theory.  *See S.N.*, ¶ 18; *T.T.*, 128 P.3d at

330 (the child was dependent or neglected under section 19-3-102(1)(b) based on the mother's past substance use because "returning the child to mother was likely to be detrimental to him").

¶ 26     Second, the evidence also showed that the child was in an injurious environment based on the parents' living situation. § 19-3-102(1)(c). The intake caseworker testified about the home in which the parents were living when the child was born and indicated that it wasn't appropriate for a child. The Department also presented photographs of the home, which showed its condition around the time that the child was born. And the jury heard evidence that the parents had been evicted from that home *before* the child was born and that they were either living in a camper outside a friend's home or inside that home with ten other people. According to mother's testimony, the people living in the home were all recovering drug or alcohol users and didn't have stable employment. Thus, whether the child was living in the first home, the camper, or the second home, there was sufficient evidence for the jury to find that the child was in an injurious environment. *See People in Interest of J.G.*, 2016 CO 39, ¶ 26 (an

13

injurious environment is a situation that is "likely harmful" to the child).

¶ 27    Third, the Department submitted sufficient evidence to prove that the child was dependent or neglected because mother failed or refused to provide the child with proper medical care. § 19-3-102(1)(d). The evidence was undisputed that the child was born at home and mother didn't take the child to the hospital or to a doctor's office after she was born. To be sure, the jury heard testimony that the child's birth was attended by a friend who was a nurse and that the child was healthy despite the lack of medical care. The jury also heard evidence that father delivered the baby and that mother refused to call an ambulance and go to the hospital because she knew that the Department would be notified and would remove the child from her care. The caseworker also testified that the Department had information that there had been no prenatal or postnatal care, the newborn infant needed to be medically evaluated, and concerns had been raised that the child possibly had breathing problems.

¶ 28    Citing to section 19-3-103(1), C.R.S. 2025, mother maintains that the child wasn't dependent or neglected when mother failed to

"immediately" bring the child to a doctor because she had "valid spiritual and personal beliefs that shaped her care of the child." Section 19-3-103(1) provides that "[n]o child who in lieu of medical treatment is under treatment solely by spiritual means through prayer in accordance with a recognized method of religious healing shall, for that reason alone, be considered to have been neglected or dependent within the purview of this article." At most, mother testified that she hadn't taken the child to a doctor because she wanted a doctor with "my beliefs and that coincides with . . . my family heritage and [father's] family heritage." She didn't testify that the child was "under treatment solely by spiritual means through prayer" or that she was doing so under a "recognized method of religious healing." *Id.* Section 19-3-103(1) therefore doesn't apply. What's more, as noted above, the jury heard testimony that mother failed to provide the child with medical care, not because of her religious beliefs, but simply because she didn't want the Department to find out about the child. We therefore reject mother's argument.

¶ 29    In sum, we conclude that the evidence was sufficient to support the jury's verdicts under section 19-3-102(1)(b), (c), and (d).

15

Based on this conclusion, we don't need to consider whether the child was also dependent or neglected under section 19-3-102(1)(e). *See People in Interest of S.M-L.*, 2016 COA 173, ¶ 29 ("[S]ection 19-3-102 requires proof of only one condition for an adjudication."), *aff'd on other grounds sub nom. People in Interest of R.S. v. G.S.*, 2018 CO 31.

¶ 30    Finally, mother argues that the Department didn't make reasonable efforts, which "caused this case to reach the adjudication stage." In support, she cites section 19-1-115(6)(b)(I), C.R.S. 2025, which requires, among other things, that a juvenile court find that "reasonable efforts have been made to prevent or eliminate the need for removal of the child from the home" before awarding legal custody to a department. However, the Department isn't required to make reasonable efforts if "an emergency situation exists which requires the immediate temporary removal of the child from the home." § 19-1-115(6)(b)(II).

¶ 31    Mother maintains that the magistrate erred by finding that an "emergency situation" existed under section 19-1-115(6)(b)(II) and therefore the Department needed to make reasonable efforts under section 19-1-115(6)(b)(I). But mother's argument isn't properly

16

before us because (1) orders entered at the temporary protective custody stage are interim orders not subject to appeal, *see People in Interest of M.W.*, 140 P.3d 231, 233 (Colo. App. 2006); and (2) even if she could appeal the temporary order, she still needed to file a petition for juvenile court review of the magistrate's order before she could appeal, *see People in Interest of K.L-P.*, 148 P.3d 402, 403 (Colo. App. 2006). As a result, mother's reasonable efforts argument necessarily fails. And mother hasn't otherwise directed us to any statute or case law that requires the juvenile court to consider whether the Department made reasonable efforts before the court can enter an adjudication order.

## IV. Jury Instructions

¶ 32     Mother asserts that the juvenile court erred by failing to provide the jury with definitions for "propensity" and "injurious environment." We disagree.

¶ 33     "When a term, word, or phrase in a jury instruction is one with which reasonable persons of common intelligence would be familiar, and its meaning is not so technical or mysterious as to create confusion in jurors' minds as to its meaning, an instruction defining it is not required." *People v. Thoro Prods. Co.*, 45 P.3d 737,

745 (Colo. App. 2001), *aff'd*, 70 P.3d 1188 (Colo. 2003). "When definitions are not provided in a jury instruction, the jury is presumed to employ the common meaning of the words used." *People v. Walden*, 224 P.3d 369, 379 (Colo. App. 2009).

¶ 34    A juvenile court must correctly instruct the jury on the law applicable to the case. *J.G.*, ¶ 33. We review de novo whether a particular jury instruction correctly states the law. *Day v. Johnson*, 255 P.3d 1064, 1067 (Colo. 2011). However, we review the court's decision to give — or not to give — a particular instruction for an abuse of discretion. *J.G.*, ¶ 33.

¶ 35    Father's attorney submitted a proposed limiting instruction for the prospective harm evidence, which included the following statement:

> The evidence may not be used to argue that because one or both parents acted, or failed to act, in a particular way involving that other child, that he or she will likely act, or fail to act, in the same way toward [the child]. That would be an impermissible "propensity" argument.

The juvenile court removed these two sentences from the final instruction and replaced them with the following: "You cannot use this evidence to show bad character or propensity." **(CF, p 401.)**

18

Father's counsel objected to the change because "the jury may not understand what propensity is[,] which is what the sentence before is defining." The court declined to define "propensity."

¶ 36 We don't see any abuse of discretion in the juvenile court's decision to decline to provide the jury with a definition for "propensity." Mother hasn't directed us to a published case addressing whether a court errs by declining to provide a jury instruction defining "propensity." But cases from other jurisdictions have defined "propensity" by using a common, rather than a technical, meaning. *See, e.g.*, *State v. Smith*, 675 P.2d 1060, 1067 (Or. Ct. App. 1984) (applying the definition of "propensity" found in Webster's Dictionary). And in any event, there is little relevant difference between the common meaning and legal definition for "propensity." *Compare* Merriam-Webster Dictionary, https://perma.cc/5XR4-DVNN ("an often intense natural inclination or preference"), *with* Black's Law Dictionary 1472 (12th ed. 2024) (defining "propensity" as "[a] natural tendency to behave in a particular way; esp., the fact that a person is prone to a specific type of bad behavior").

¶ 37    Father's counsel also submitted a proposed jury instruction that stated, in pertinent part, the following: "An injurious environment exists when the children are in a situation that is likely harmful.  Injurious means adverse, bad or damaging. Environment means the circumstances, objects, or conditions by which one is surrounded."  Mother's attorney joined father's counsel's request to define injurious environment for the jury.  The juvenile court rejected the proposed instruction because (1) "we don't have a standard definition for injurious environment"; (2) "the ordinary person off the street can come up with a definition"; and (3) "if the jury [was] hung up on this issue, they can ask a question."

¶ 38    The juvenile court didn't abuse its discretion by declining to define "injurious environment."  The injurious environment instruction provided by the court tracked the statutory language and the model jury instructions.  *See* § 19-3-102(1)(c); CJI-Civ. 41:20 (2025).  A previous version of the model instructions included a definition for injurious environment, which has since been deleted and not replaced.  *See* CJI-Civ. 41:10 n.1 (2025).  Because the phrase isn't defined by statute or model instruction, the jury could

20

give the phrase its ordinary meaning, which, as the court pointed out, was "not so technical or mysterious as to create confusion in jurors' minds as to its meaning." *Thoro Prods. Co.*, 45 P.3d at 745. Finally, the jury didn't express any confusion about what the phrase meant, and mother hasn't explained on appeal "how the jury would have attributed an incorrect meaning to it." *People v. Claycomb*, 2025 COA 36, ¶ 32.

¶ 39    In sum, we conclude that the juvenile court didn't abuse its discretion by declining to provide the jury with additional definitions for "propensity" and "injurious environment" because the ordinary meanings of those terms, which we presume the jurors knew, adequately informed the jurors about those concepts. *See Walden*, 224 P.3d at 379.

## V.    Expert Qualification

¶ 40    Mother argues that the juvenile court erred when it qualified the intake caseworker as an expert. Again, we disagree.

¶ 41    Under CRE 702, an expert witness may be qualified to offer expert testimony based on any of the five factors in CRE 702: (1) knowledge; (2) skill; (3) experience; (4) training; or (5) education. *Huntoon v. TCI Cablevision of Colo., Inc.*, 969 P.2d 681, 690 (Colo.

21

1998).  The decision to qualify a caseworker as an expert is left to the juvenile court's sound discretion, and we won't disturb its decision absent a clear showing of an abuse of discretion.  *People in Interest of L.G.*, 737 P.2d 431, 435 (Colo. App. 1987).

¶ 42    The record shows that the intake caseworker had (1) a bachelor's degree in psychology and was working towards a master's degree in forensic psychology; (2) worked for the Department as a caseworker for three years; (3) previously worked with children in an inpatient treatment facility for about a year; (4) completed the training and certification process for caseworkers in Colorado, along with continuing education courses since becoming certified; (5) participated in more than 500 intake assessments; and (6) previously been qualified as an expert in child welfare.  Focusing on the caseworker's leadership role, her three years of experience at the Department, and her 500 intake investigations, the juvenile court qualified her as an expert in child welfare based on her knowledge, experience, and training.

¶ 43    Mother asserts that the juvenile court erred by qualifying the caseworker as an expert in child welfare because the caseworker didn't have any "specialized knowledge" in child welfare and any

22

knowledge she did have was "fully supplied by the Petitioner in this case." Her argument fails for two reasons. First, in addition to her knowledge, the court qualified the caseworker as an expert based on her experience and training; mother forwards no argument as to how the caseworker lacked the requisite experience or training to be an expert in child welfare. Second, mother provides no authority for the proposition that an expert can't gain relevant knowledge by working for a party in the case.

¶ 44    We therefore conclude that the court didn't abuse its discretion. *See People in Interest of A.E.L.*, 181 P.3d 1186, 1193 (Colo. App. 2008) (discerning no abuse of discretion in the court's decision to qualify caseworkers as experts in social work with an emphasis in child protection).

## VI.    Scope of Cross-Examination

¶ 45    Mother maintains that the juvenile court erred by allowing the county attorney to ask father questions on cross-examination that were outside the scope of the direct examination. We disagree.

¶ 46    The juvenile court has discretion to "exercise reasonable control over interrogation of witnesses and presentation of evidence." *People v. Whitman*, 205 P.3d 371, 378 (Colo. App. 2007).

Under CRE 611(b), "[c]ross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness."

¶ 47     On direct examination, father's attorney asked him about the child's home birth in April 2024, events connected to the child's removal in June 2024, and father's employment situation. On cross-examination, father's attorney objected to questions about his other children and previous cases as outside the scope of direct examination. Counsel also objected to a juror question about his conversations with the caseworker.

¶ 48     Mother's attorney didn't join in these objections or otherwise raise any issue with these questions as beyond the scope of the direct examination. Although we are skeptical that one parent can assert on appeal an issue that was only raised by the other parent, we will address most of father's counsel's objections. However, we decline to address father's attorney's objection to a juror question about the child's birth certificate because father's attorney objected on a different ground from the one mother now raises. *See People v. Ujaama*, 2012 COA 36, ¶ 37 (an issue is unpreserved if an objection

was made in the trial court but on grounds different from those raised on appeal).

¶ 49    We reject mother's argument for two reasons.  First, because CRE 611(b) allows the juvenile court discretion to permit a party to ask about "additional matters as if on direct examination," the challenged questions were permissible even if they were outside the scope of direct examination.  Second, even assuming the court erred, we discern no reversible error because the evidence was either cumulative or played a minimal role in the Department's case.  *See People v. Casias*, 2012 COA 117, ¶ 64.  Mother provides no explanation as to how this evidence prejudiced her.

## VII.   Disposition

¶ 50    The judgment is affirmed.

JUDGE KUHN and JUDGE MOULTRIE concur.

25